[No. S101003. Apr. 24, 2003.]

JOSE E. CRUZ et al., Plaintiffs and Respondents, v.
PACIFICARE HEALTH SYSTEMS, INC., et al., Defendants and
Appellants.

## COUNSEL

Cooley Godward, William E. Grauer, Martin S. Schenker, Christopher R. J. Pace and James V. Fazio III for Defendants and Appellants.

Fred Main; Wiggin & Dana, Mark R. Kravitz and Jonathan Freiman for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Appellants.

Epstein Becker & Green, William A. Helvestine and Michael Horan for American Association of Health Plans and California Association of Health Plans as Amici Curiae on behalf of Defendants and Appellants.

McDermott, Will & Emery, Elizabeth D. Mann, Michael L. Meeks and Sarah A. Sommer for American Specialty Health Plans of California, Inc., and American Specialty Health Networks, Inc., as Amici Curiae on behalf of Defendants and Appellants.

Severson & Werson and William L. Stern for California Bankers Association, Securities Industry Association, California Financial Services Association and American Financial Services Association as Amici Curiae on behalf of Defendants and Appellants.

Gibson, Dunn & Crutcher, Gail E. Lees and Mark A. Perry for Aetna Health, AT&T Wireless Services, Cingular Wireless, Sprint and Verizon Wireless as Amici Curiae on behalf of Defendants and Appellants.

The Furth Firm, Frederick P. Furth, Michael P. Lehmann and Ben Furth for Plaintiffs and Respondents.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Herschel T. Elkins, Assistant Attorney General, Ronald A. Reiter and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Respondents.

Robinson, Calcagnie & Robinson, Sharon J. Arkin; The Sturdevant Law Firm, James C. Sturdevant; Paul Bland; Deborah M. Zuckerman and Stacy J. Canan for Trial Lawyers for Public Justice, AARP, National Association of Consumer Advocates and Consumer Attorneys of California as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**MORENO J.**—In *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*), we held that claims for injunctive relief under the Consumers Legal Remedies Act (CLRA) designed to protect the public from deceptive business practices were not subject to arbitration. In this case, we consider whether *Broughton* is good law in light of two recent United States Supreme Court cases pertaining to arbitration, *Green Tree Fin. Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [121 S.Ct. 513, 148 L.Ed.2d 373] (*Green Tree*) and *Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105 [121 S.Ct. 1302, 149 L.Ed.2d 234] (*Circuit City*). We conclude that it is.

We also consider whether *Broughton*'s holding on the inarbitrability of CLRA public injunctions should be extended to include claims to enjoin unfair competition under Business and Professions Code section 17200 et seq. and to enjoin misleading advertising under Business and Professions Code section 17500 et seq. We conclude that *Broughton* should be extended to such claims, at least under the circumstances of the present case.

We further consider whether *Broughton* should be extended to statutory and common law claims for equitable monetary relief—for restitution, disgorgement, and unjust enrichment. We conclude that *Broughton* should not be thus extended.

## I. STATEMENT OF FACTS

In November 1999, plaintiff Jose E. Cruz filed an action against defendants PacifiCare Health Systems, Inc., and PacifiCare of California, Inc.

(collectively PacifiCare), alleging claims for unfair competition and false advertising in connection with PacifiCare's sale, marketing, and rendering of medical services. In his first amended complaint, Cruz alleged that he was an enrollee in one of the various health plans PacifiCare offers and operates in California. He also alleged that "through its misleading and deceptive material representations and omissions," PacifiCare has employed a "fraudulent, unlawful, and/or unfair scheme designed to induce" persons to enroll in its health plans by "misrepresenting . . . that its primary commitment . . . is to maintain and improve the quality of healthcare provided." In fact, Cruz alleged, PacifiCare "has been aggressively engaged in implementing undisclosed systemic internal policies that are designed, *inter alia*, to discourage PacifiCare's primary care physicians from delivering medical services and to interfere with the medical judgment of PacifiCare healthcare providers." The result of these policies, he alleged, is a "reduction in the quality of [provided] healthcare" that "is directly contrary to PacifiCare's representations."

Cruz emphasized in his first amended complaint that he "does not challenge the denial of medical benefits to any enrollee or subscriber," but "challenges the manner in which PacifiCare . . . induced persons to subscribe to its Health Plans . . . by misrepresenting or failing to disclose internal policies that lower the quality of services provided." Cruz alleged that he was filing the action "in his individual capacity and on behalf of the general public," and he sought to represent a class of "approximately 1.6 million PacifiCare Health Plan enrollees in California."

Based on these general allegations, Cruz alleged four causes of action. In the first, he alleged that PacifiCare had violated Business and Professions Code section 17500 by "engaging in false advertising" that "reduce[d] the quality of medical services available to . . . enrollees" and "decrease[d] the value of the [health coverage] for which [they] paid." To remedy this alleged violation, Cruz requested "an order enjoining [PacifiCare] from violating [Business and Professions Code section] 17500 and requiring [it] to disgorge . . . all of [its] ill-gotten gains and monies wrongfully acquired." The second cause of action alleged that in violating various state statutes, PacifiCare had committed an unfair, unlawful, or fraudulent business act or practice under Business and Professions Code section 17200 that "reduce[d] the quality of medical services available to" enrollees and "decrease[d] the value of their respective [h]ealth [p]lans." To remedy this alleged violation, Cruz requested "an order enjoining [PacifiCare] from violating [Business and Professions Code section] 17200 and requiring [it] to disgorge . . . all of [its] ill-gotten gains and monies wrongfully acquired." The third cause of action alleged that PacifiCare's misrepresentations violated the CLRA (Civ. Code, § 1770). To remedy this alleged violation, Cruz requested "an order

enjoining [PacifiCare's] wrongful acts and practices" and requiring that PacifiCare "make restitution . . . of all monies paid to" it. Cruz also stated his intent to add a request for actual damages if PacifiCare failed to remedy the damage from its violation. The fourth cause of action was for unjust enrichment, and alleged that as a result of PacifiCare's conduct, enrollees had "receiv[ed] a lower quality of care than advertised and represented by" PacifiCare. As to remedy, Cruz requested "restitution, refund, or reimbursement of" certain monies paid by or on behalf of enrollees, and "disgorgement of the excessive and ill-gotten monies obtained by [PacifiCare] as a result of the unlawful, fraudulent, or unfair business acts and practices and untrue and misleading advertisements."

PacifiCare moved for an order compelling Cruz to arbitrate his claims and staying the action pending completion of arbitration. PacifiCare argued that Cruz, who obtained health coverage through his employer, was required to arbitrate his claims under several provisions of the subscriber agreement between his employer and PacifiCare. PacifiCare relied primarily on paragraph 15.02 of the subscriber agreement, which provides in part: "**ARBITRATION. PACIFICARE USES BINDING ARBITRATION TO RESOLVE ANY AND ALL DISPUTES BETWEEN PACIFICARE AND GROUP OR MEMBER, INCLUDING . . . DISPUTES RELATING TO THE DELIVERY OF SERVICES UNDER THE PACIFICARE HEALTH PLAN. PACIFICARE, GROUP AND MEMBER EACH UNDERSTAND AND EXPRESSLY AGREE THAT BY ENTERING INTO THE PACIFICARE SUBSCRIBER AGREEMENT, PACIFICARE, GROUP AND MEMBER ARE EACH VOLUNTARILY GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ALL SUCH DISPUTES DECIDED IN A COURT OF LAW BEFORE A JURY, AND INSTEAD ARE ACCEPTING THE USE OF BINDING ARBITRATION.**" PacifiCare also relied on paragraph 7.01.01 of the subscriber agreement, which establishes a procedure for "Member Appeals not related to quality of care" and provides that a member who is not satisfied with the outcome of PacifiCare's internal appeals process "may . . . submit or request that PacifiCare submit the Appeal to binding arbitration before the American Arbitration Association" (AAA). Paragraph 7.01.01 also provides: "Upon submission of a dispute to the [AAA], Member and PacifiCare agree to be bound by the rules of procedure and decision of the [AAA]." Paragraph 7.01.01 concludes by stating: "**PACIFICARE AND MEMBER UNDERSTAND THAT BY ENTERING INTO THIS AGREEMENT, THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION.**" PacifiCare also relied on Cruz's signed enrollment form, which stated that he

"agree[d] to and underst[ood]" several terms and conditions, including: (1) "To be bound by the PacifiCare . . . Subscriber Agreement"; and (2) that "[a]ny differences between myself . . . and PacifiCare . . . relating to PacifiCare . . . or its performance are subject to binding arbitration." Finally, PacifiCare relied on the member handbook it sent to Cruz, which describes PacifiCare's internal appeals process and, for members unsatisfied with the result of that process, the option of arbitration before the AAA. The member handbook also states: "**MEMBERS UNDERSTAND THAT BY ENROLLING IN PACIFICARE, THEY AGREE TO GIVE UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY DISPUTE DECIDED IN A COURT OF LAW BEFORE A JURY AND INSTEAD ARE ACCEPTING THE USE OF ARBITRATION FOR RESOLVING DISPUTES WITH PACIFICARE.**"

Cruz opposed PacifiCare's motion on several grounds. He first argued that the applicable arbitration provision does not encompass this dispute because the paragraph in the subscriber agreement requiring arbitration before the AAA governs appeals "'not related to quality of care'" and his complaint "is *solely* . . . directed to the 'quality of care' provided by PacifiCare." Second, he argued that his requests for injunctive relief are inarbitrable under *Broughton*. Third, he argued that the arbitration clause is unconscionable. Finally, he argued that because PacifiCare did not enter into any agreement with either him or his employer, it may not invoke the arbitration clause.

PacifiCare offered several arguments in response. Regarding Cruz's contention under *Broughton*, PacifiCare argued that *Broughton* prohibits arbitration only of claims for injunctive relief under the CLRA, and does not prohibit arbitration of Cruz's "monetary" claims for disgorgement, restitution and reimbursement or his request for injunctive relief under Business and Professions Code sections 17200 and 17500. Regarding the scope of arbitration, PacifiCare argued that because the language of paragraph 15.02 of the subscriber agreement requires "**BINDING ARBITRATION TO RESOLVE *ANY AND ALL* DISPUTES BETWEEN PACIFICARE AND GROUP OR MEMBER**" (italics added), it includes claims related to quality of care. Supporting this interpretation, PacifiCare asserted, is the fact that "the one example [paragraph 15.02] provides of a covered dispute— 'allegations against PacifiCare of medical malpractice'—addresses a claim involving quality of care." PacifiCare also argued that "even if 'quality of care' issues were exempt from arbitration," Cruz does not raise quality of care issues, and his claims therefore do not fall within this exemption. Finally, PacifiCare argued that the arbitration clause was not unconscionable.

The trial court denied PacifiCare's motion to compel arbitration. It reasoned that *Broughton* expressly precludes arbitration of Cruz's claim for injunctive relief under the CLRA, and it "extended" *Broughton*'s reasoning to claims for injunctive relief under Business and Professions Code sections 17200 and 17500 "by an individual acting as a private attorney general." The court also reasoned that Cruz's claims for disgorgement, restitution, and unjust enrichment are inarbitrable as essentially equitable remedies distinct from damages. Given these conclusions, the court expressly declined to rule on any of Cruz's other objections to PacifiCare's motion.

The Court of Appeal affirmed, relying on *Broughton* and rejecting PacifiCare's argument that the United States Supreme Court had abrogated *Broughton* in subsequent decisions. It also upheld the trial court's extension of *Broughton* to claims for disgorgement and restitution under Business and Professions Code section 17200 et seq., relying primarily on the public benefit derived from those remedies and the interrelationship between those remedies and injunctive relief. The court limited its holding to equitable remedies within the context of class action claims. Like the trial court, the Court of Appeal did not consider any of Cruz's other arguments against arbitration. We then granted PacifiCare's petition for review.

## II. Discussion

### A. *Did Green Tree and Circuit City Overrule Broughton?*

PacifiCare contends that our decision in *Broughton, supra,* 21 Cal.4th 1066, holding that injunctive relief claims under the CLRA are inarbitrable, should be overruled in light of *Green Tree, supra,* 531 U.S. 79, and *Circuit City, supra,* 532 U.S. 105. According to PacifiCare, these two post-*Broughton* decisions, read in conjunction with earlier United States Supreme Court decisions, make clear that only Congress—and not state legislatures—may create exceptions to the Federal Arbitration Act's (FAA) requirement that arbitration agreements be enforced according to their terms, and that therefore state courts cannot hold that certain requests for public injunctive relief are inarbitrable. We disagree.

In *Broughton,* we recognized that the United States Supreme Court has emphasized Congress's and its own policy in favor of arbitration and, at least since 1984, has rejected numerous efforts and arguments by state courts, federal courts and litigants to declare certain classes of cases not subject to arbitration. (*Broughton, supra,* 21 Cal.4th at pp. 1074-1075.) Indeed, we acknowledged the Supreme Court's broad statement in its seminal arbitration case, *Southland Corp. v. Keating* (1984) 465 U.S. 1, 10 [104

S.Ct. 852, 858, 79 L.Ed.2d 1], that " '[i]n enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " (*Broughton, supra*, 21 Cal.4th at p. 1074.)

We nonetheless held that requests for injunctive relief designed to benefit the public presented a narrow exception to the rule that the FAA requires state courts to honor arbitration agreements. We reasoned that the Supreme Court has acknowledged that Congress may " 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration' " (*Broughton, supra*, 21 Cal.4th at p. 1074, quoting *Southland Corp. v. Keating, supra*, 465 U.S. at p. 10 [104 S.Ct. at p. 858]), and that "[t]he unsuitability of a statutory claim for arbitration turns on congressional intent, which can be discovered in the text of the statute in question, its legislative history or in an ' "inherent conflict" between arbitration and the [statute's] underlying purposes.' " (*Broughton, supra*, 21 Cal.4th at p. 1075, quoting *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 26 [111 S.Ct. 1647, 1652, 114 L.Ed.2d 26] (*Gilmer*).)

We then concluded that there was indeed an inherent conflict between arbitration and the CLRA's authorization in Civil Code section 1780, subdivision (a)(2) for injunctive relief designed to protect the public, e.g., to stop deceptive business practices. As we stated: "[T]here are two factors taken in combination that make for an 'inherent conflict' between arbitration and the underlying purpose of the CLRA's injunctive relief remedy. First, that relief is for the benefit of the general public rather than the party bringing the action." (*Broughton, supra*, 21 Cal.4th at p. 1082.) In reaching this conclusion, we distinguished requests for public injunctions from other sorts of actions, such as antitrust suits, in which the public benefit is incidental to the plaintiff's award of damages; unlike private suits for damages, in a public injunction action a plaintiff acts in the purest sense as a private attorney general. (*Id.* at pp. 1075-1077.) "Second, the judicial forum has significant institutional advantages over arbitration in administering a public injunctive remedy, which as a consequence will likely lead to the diminution or frustration of the public benefit if the remedy is entrusted to arbitrators." (*Id.* at p. 1082.) We reasoned that an arbitrator lacked the institutional continuity and the appropriate jurisdiction to sufficiently enforce and, if needed, modify a public injunction. (*Id.* at p. 1081.)[1] We concluded: "Given this inherent conflict, we will presume, absent indications

---

[1]Justice Chin's concurring and dissenting opinion finds significant the United States Supreme Court's holding that a decision of the New York Court of Appeals, *Garrity v. Lyle Stuart, Inc.* (1976) 40 N.Y.2d 354 [386 N.Y.S.2d 831, 353 N.E.2d 793, 83 A.L.R.3d 1024],

to the contrary, that the Legislature did not intend that the injunctive relief claims be arbitrated." (*Broughton*, at p. 1082.) We discerned no such legislative intent. (*Ibid.*)

We further concluded that denying arbitration in this one area would not violate the FAA. As we stated: "[A]lthough the court has stated generally that the capacity to withdraw statutory rights from the scope of arbitration agreements is the prerogative solely of Congress, not state courts or legislatures (*Southland Corp. v. Keating, supra*, 465 U.S. at p. 18 [104 S.Ct. at p. 862]), it has never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests. In the present case, as discussed, we believe there is such an inherent conflict between arbitration and a statutory injunctive relief remedy designed for the protection of the general public. Although both California and federal law recognize the important policy of enforcing arbitration agreements, it would be perverse to extend the policy so far as to preclude states from passing legislation the purposes of which make it incompatible with arbitration, or to compel states to permit the vitiation through arbitration of the substantive rights afforded by such legislation.

"In other terms, our holding does not represent a ' "suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants" . . . "out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes" ' [Citation.] Rather, it is a recognition that arbitration cannot necessarily afford all the advantages of adjudication in the area of private attorney general actions, that in a narrow class of such actions arbitration is inappropriate, and that this inappropriateness does not turn on the happenstance of whether the rights and remedies being adjudicated are of state or federal derivation.

---

prohibiting arbitration of punitive damages claims, is preempted by the FAA. (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58 [115 S.Ct. 1212, 1216-1217, 131 L.Ed.2d 76].) In particular, the opinion points to the Supreme Court's implicit rejection of *Garrity*'s rationale that punitive damage awards require "rather close judicial supervision" that would be lacking in arbitration. (*Garrity, supra*, 386 N.Y.S.2d at p. 834 [353 N.E.2d at p. 796].) Yet it is evident that what *Garrity* meant by "judicial supervision" was simply adequate judicial and appellate review of punitive damage awards, not the ongoing monitoring, enforcement, and modification that is required of public injunctions. (See *id.* at p. 835 [353 N.E.2d at p. 797].) As we have recognized, the supposed inadequacy of judicial review of arbitration awards is not grounds for holding a claim inarbitrable, even when the arbitration involves a matter of public importance. (*Broughton, supra*, 21 Cal.4th at p. 1086.) Moreover, punitive damages, unlike public injunctions, confer a direct benefit on the plaintiffs seeking them, and are in principle little different from the treble damages antitrust awards that we acknowledged in *Broughton* to be fully arbitrable. (*Id.* at pp. 1075-1076.)

"Nor does anything in the legislative history of the FAA suggest that Congress contemplated 'public injunction' arbitration within the universe of arbitration agreements it was attempting to enforce. Indeed, the primary focus of the drafters of the FAA appears to have been on the utility of arbitration in resolving ordinary commercial disputes. [Citations.] Although the court has interpreted the FAA to extend to noncommercial statutory claims, it is doubtful Congress would have envisioned the extension of the FAA to enforce arbitral jurisdiction over a public injunction." (*Broughton, supra,* 21 Cal.4th at pp. 1083-1084, fn. omitted.)

The recent United States Supreme Court cases cited by PacifiCare have little if any bearing on our holding in *Broughton*. In *Circuit City, supra,* 532 U.S. 105, the court concluded that section 1 of the FAA, which exempts from the scope of the FAA "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" (9 U.S.C. § 1), did not exempt most employment contracts. The opinion was principally concerned with an analysis of the meaning of section 1, not the preemptive scope of section 2. The majority rejected the position of various amici curiae, including attorneys general of 22 states, who argued that applying the FAA to employment contracts would interfere with the employment policies of the states. In rejecting this argument, the court reaffirmed *Southland,* and declined to "chip away" at that case by what the majority termed "an unconventional reading" of section 1. (*Circuit City, supra,* 532 U.S. at p. 122 [121 S.Ct. at p. 1313].) *Broughton,* of course, was neither predicated on overruling *Southland* nor on construing section 1 of the FAA. The *Circuit City* court did not address the central question in *Broughton*—whether public injunctions were arbitrable. Nor did it shed any further light on the "inherently incompatible" exception to arbitrability.

Still less is *Green Tree, supra,* 531 U.S. 79, relevant to *Broughton*. That case was narrowly focused on the issue of cost sharing in the arbitration of federal statutory claims. *Green Tree*'s holding did not concern federal preemption of state arbitration claims. Nor did its reiteration of Congress's strong pro-arbitration policy (*id.* at p. 92 [121 S.Ct. at pp. 522-523]) call *Broughton* into question. As discussed above, *Broughton* takes such a policy as a given. (*Broughton, supra,* 21 Cal.4th at pp. 1074-1075.)

In sum, nothing that is novel about *Green Tree* or *Circuit City* has any bearing on *Broughton*. The only parts of these opinions that remotely pertain to *Broughton* are recapitulations of familiar themes regarding the importance of enforcing arbitration agreements and the inability of states to prevent that enforcement. These were amply considered in *Broughton*. Moreover, we were presented in *Broughton* with extensive argument that CLRA public

injunctions were arbitrable. (See *Broughton, supra,* 21 Cal.4th at pp. 1088-1103 (dis. opn. of Chin, J.).) We decline PacifiCare's invitation to revisit this argument.

B. *Are Injunctions Under Business and Professions Code Sections 17200 and 17500 Arbitrable?*

PacifiCare contends that even if we affirm our holding in *Broughton* that claims for injunctive relief under the CLRA are inarbitrable, the same should not hold true for injunctive relief claims under the unfair competition law (UCL), Business and Professions Code section 17200 et seq., and claims of false advertising under Business and Professions Code section 17500. We disagree under the circumstances of the present case.

■ The UCL is intended to proscribe "unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) The law provides that any person engaged in unfair competition may be enjoined. (*Id.,* § 17203.) Moreover, "[s]tanding to sue under the UCL is expansive . . . . Unfair competition actions can be brought by a public prosecutor or 'by any person acting for the interests of itself, its members or the general public.' " (*Korea Supply Co. v. Lockheed Martin Corp.* ((2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*), quoting Bus. & Prof. Code, § 17204.) The UCL is intended to protect competitors as well as consumers from unfair practices. (*Tippett v. Terich* (1995) 37 Cal.App.4th 1517, 1536 [44 Cal.Rptr.2d 862].) Thus, there may be occasions in which the injunctive power of the UCL is used primarily to redress injuries to competing businesses and only incidentally for the public benefit. (See, e.g., *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 188-190 [83 Cal.Rptr.2d 548, 973 P.2d 527].) In *Broughton,* we declined to decide whether requests for injunctive relief designed primarily to rectify individual wrongs were arbitrable. (*Broughton, supra,* 21 Cal.4th at p. 1080, fn. 5.)

■ We need not decide whether UCL injunctive relief actions brought by injured business competitors are arbitrable. In the present case, the request for injunctive relief is clearly for the benefit of health care consumers and the general public by seeking to enjoin PacifiCare's alleged deceptive advertising practices. The claim is virtually indistinguishable from the CLRA claim that was at issue in *Broughton.* (*Broughton, supra,* 21 Cal.4th at p. 1072 [Broughton sought to enjoin health care company's alleged deceptive advertising of its medical services].)

The same is true of Cruz's request to enjoin PacifiCare's alleged misleading advertising under Business and Professions Code section 17500. That

section makes unlawful "untrue or misleading" statements designed to "induce the public to enter into any obligation" to purchase various goods and services. (*Ibid.*) Section 17535 authorizes the enjoining of such statements by various government officials and members of the public. Cruz's injunctive relief claim under section 17535 is essentially requesting the same relief for the same reason as is his UCL claim. (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210 [197 Cal.Rptr. 783, 673 P.2d 660] [same false advertising claim may give rise to actions under the UCL and Bus. & Prof. Code, § 17500].) In other words, Cruz's action to enjoin PacifiCare's alleged deceptive business practices is undertaken for the public benefit, whether designated as a claim under the CLRA or Business and Professions Code section 17200 or section 17500: it is designed to prevent further harm to the public at large rather than to redress or prevent injury to a plaintiff. As such, for the reasons discussed in *Broughton*, there is an " 'inherent conflict' between arbitration and the underlying purpose of [those statutes'] injunctive relief remedy." (*Broughton, supra,* 21 Cal.4th at p. 1082.)

We therefore conclude that Cruz's injunctive relief claim is inarbitrable unless there are indications of legislative intent to the contrary in the UCL or Business and Professions Code section 17500. (*Broughton, supra,* 21 Cal.4th at p. 1082.) We discern no such intent. Business and Professions Code sections 17203 and 17535 both provide that injunctive relief claims are to be brought in "any *court* of competent jurisdiction." (Italics added.) PacifiCare points to certain features in the CLRA not present in the UCL, such as the CLRA antiwaiver provision (Civ. Code, § 1751) and the fact that it provides for more extensive remedies than the UCL or Business and Professions Code section 17500 (Civ. Code, § 1780). (See *Broughton, supra,* 21 Cal.4th at p. 1077.) But these were not the characteristics we relied on in concluding that requests for injunctive relief under the CLRA are inarbitrable. (*Broughton,* at p. 1082.) The absence of these features in the UCL or in Business and Professions Code section 17500 does not persuade us that the Legislature intended to allow arbitration of public injunctive relief requests under these statutes. We therefore conclude that each of Cruz's injunctive relief requests is inarbitrable.[2]

---

[2]We note that the Courts of Appeal that have considered this issue have reached a similar conclusion. (See *Warren-Guthrie v. Health Net* (2000) 84 Cal.App.4th 804, 817 [101 Cal.Rptr.2d 260] [concluding injunctive relief request under Bus. & Prof. Code, § 17200 inarbitrable under *Broughton*]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 692 [99 Cal.Rptr.2d 809] [same]; *Groom v. Health Net* (2000) 82 Cal.App.4th 1189, 1199 [98 Cal.Rptr.2d 836] [same].)

### C. *Are Cruz's Claims for Restitution and Disgorgement Under the UCL Arbitrable?*

PacifiCare contends the Court of Appeal erred in extending *Broughton* to hold that claims for restitution and disgorgement under the UCL are inarbitrable. We agree.

In *Broughton*, we held that damages claims under the CLRA are arbitrable, notwithstanding the fact that such claims vindicate important statutory rights. After reviewing United States Supreme Court precedent regarding the arbitration of antitrust and other federal statutory claims, we concluded that such precedent establishes that "statutory damages claims are fully arbitrable. Such an action is primarily for the benefit of a party to the arbitration, even if the action incidentally vindicates important public interests. [Citation.] In the context of statutory damage claims, the United States Supreme Court has consistently rejected plaintiffs' arguments that abbreviated discovery, arbitration's inability to establish binding precedent, and a plaintiff's right to a jury trial render the arbitral forum inadequate, or that submission of resolution of the claims to arbitration is in any sense a waiver of the substantive rights afforded by statute. [Citations.] 'By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " (*Broughton, supra,* 21 Cal.4th at p. 1084.)[3]

Under the UCL, remedies are limited. "A UCL action is equitable in nature; damages cannot be recovered. [Citation.] . . . '[P]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (*Korea Supply, supra,* 29 Cal.4th at p. 1144.) In the UCL context, an order for restitution is an order "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126-127 [96 Cal.Rptr.2d 485, 999 P.2d 718], fn. omitted.)

As we noted in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706], Civil Code section 3281 defines "damages": "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault

---

[3]In *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 99-113 [99 Cal.Rptr.2d 745, 6 P.3d 669], we held that arbitration of unwaivable statutory claims pursuant to a mandatory arbitration employment agreement required the incorporation of certain procedural protections. Cruz does not raise the issue whether those protections apply in the present context of arbitrating statutory consumer protection claims, and we do not address this issue.

a compensation therefor in money, which is called damages." We concluded that damages, thus broadly defined, "may include a restitutionary element." (*Cortez, supra*, 23 Cal.4th at p. 174.) Given this overlap, there appears to be no reason why restitutionary claims, like CLRA claims for damages, should not be arbitrable. Nothing in *Broughton*'s functional analysis suggests that the mere designation of restitution as an equitable remedy makes the request for the remedy inarbitrable. Moreover, although Cruz argues that restitution under the UCL accomplishes a public purpose by deterring unlawful conduct, the same could be said of damages under the CLRA or under various federal statutes. This deterrent effect is, however, incidental to the private benefits obtained from those bringing the restitutionary or damages action. (*Broughton, supra*, 21 Cal.4th at p. 1084.) The Supreme Court has made clear that such actions, notwithstanding the public benefit, are fully arbitrable under the FAA. (*Ibid.*)[4]

The Court of Appeal in the present case expressly limited its holding of inarbitrability to UCL class action suits. A class action may be primarily for the public benefit. But public benefit is only *one* of the factors we identified in *Broughton* as weighing in favor of the action's inarbitrability. (*Broughton, supra*, 21 Cal.4th at p. 1082.) The other factor, the "institutional advantages" of the judicial forum over arbitration in the administration of a public injunction, is not present. (*Ibid.*) It may be the case that under the UCL, a class action would allow for disgorgement into a fluid recovery fund and distribution by various means. (See *Kraus v. Trinity Management Services, Inc., supra*, 23 Cal.4th at pp. 127, 137; *Korea Supply, supra*, 29 Cal.4th at p. 1148, fn. 6.) But the establishment of such a fund and the distribution of its proceeds does not present the same order of institutional difficulty as does the maintenance of a permanent statewide injunction requiring judicial supervision. We agree with the one published case on this issue that "[u]nlike a public injunction, disgorgement of funds does not need to be continuously monitored because its object is limited in time and scope. Once the profits to be disgorged and the recipients of those funds are identified, there is no need for long term modification and correction necessitating judicial supervision. Therefore, . . . disgorgement of funds is essentially the same as awarding money damages, and within the power of the arbitrators to award. [T]here is no 'inherent conflict' between this remedy and arbitration." (*Arriaga v. Cross Country Bank* (S.D.Cal. 2001) 163 F.Supp.2d 1189, 1197.)

---

[4]We note that the language authorizing restitution for misleading advertising practices under Business and Professions Code section 17535 is virtually identical to the language authorizing restitution found in section 17203 under the UCL. Both provisions declare that a "court may make such orders or judgments" as "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by" the business practices made unlawful by the statute in question. We therefore assume, at least on the issue of arbitrability, that section 17535 should be construed the same way as section 17203.

Moreover, in this state we recognize classwide arbitration as a means of bringing collective legal action by parties bound to an arbitration agreement. (*Keating v. Superior Court* (1982) 31 Cal.3d 584, 612-613 [183 Cal.Rptr. 360, 645 P.2d 1192], overruled on other grounds in *Southland Corp. v. Keating, supra*, 465 U.S. 1; *Blue Cross of California v. Superior Court* (1998) 67 Cal.App.4th 42 [78 Cal.Rptr.2d 779].) Without addressing questions not before us, we anticipate that courts may find it appropriate to become involved in supervising the equitable distribution of assets resulting from a class recovery, assuming entitlement to such recovery has been established. But we foresee that they would be able to do so without becoming involved in the merits of the underlying dispute. The same cannot be said for the supervision, continued enforcement, and modification of a public injunction, wherein judicial involvement would appear to be both inevitable and desirable. (See *Broughton, supra*, 21 Cal.4th at pp. 1080-1082.)[5]

Amici Curiae Trial Lawyers for Public Justice et al. argue that a recent United States Supreme Court case, *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279 [122 S.Ct. 754, 151 L.Ed.2d 755], supports their position that all UCL claims are inarbitrable. In *Waffle House*, the Supreme Court majority held that the Equal Employment Opportunity Commission (EEOC) may sue employers not only when it seeks to enjoin discriminatory employment practices, but also for victim-specific relief, such as reinstatement and backpay, even when the employee on whose behalf it is acting is a party to a binding arbitration agreement. The court reasoned that the EEOC was neither a party to the arbitration agreement nor a mere proxy for the employee on whose behalf the action was brought, but rather an agency charged by Congress with the vindication of the public interest. (*Id.* at pp. 288-291 [122 S.Ct. at pp. 761-762].) The court noted their conclusion might have differed if the EEOC could prosecute the action without the employee's consent, or if the employee had the final say in the EEOC's prayer for relief. (*Id.* at p. 291 [122 S.Ct. at p. 763].) The three-person dissent agreed with the majority that the EEOC was not bound by employee arbitration agreements when it pursued non-victim-specific relief, but would have held that it was prevented by the arbitration agreement from bringing an action for victim-specific relief on those employees' behalf. (*Id.* at p. 298 [122 S.Ct. at pp. 766-767] (dis. opn. of Thomas, J.).)

---

[5]We note that the United States Supreme Court has recently granted a writ of certiorari in a case that may decide the validity of classwide arbitration when class action is not provided for in the arbitration agreement. (*Green Tree Fin. Corp. v. Bazzle* (2002) 351 S.C. 244 [569 S.E.2d 349] cert. granted (2003) 537 U.S. 1098 [123 S.Ct. 817, 154 L.Ed.2d 766].) The unavailability of classwide arbitration would not alter our conclusion in the present case. As the Supreme Court has stated in rejecting the argument that the unavailability of classwide relief is grounds for not enforcing an arbitration agreement: " '[E]ven if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that [a statute] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.' " (*Gilmer, supra*, 500 U.S. at p. 32 [111 S.Ct. at p. 1655].)

Amici curiae compare the private attorney general action brought under Business and Professions Code section 17204 with an action brought by the EEOC, and argue that anyone acting in a private attorney general capacity should not be bound by an arbitration agreement. ■ But in light of the United States Supreme Court's strong presumption in favor of enforcing arbitration agreements reviewed above, we do not read *Waffle House* as permitting a party to an arbitration agreement to evade its contractual obligation to settle its own restitutionary claims through arbitration merely by acting as a representative on behalf of other similarly situated claimants.[6]

We therefore conclude that Cruz's actions for restitution and/or disgorgement, whether brought as an individual or as a class action, are arbitrable.[7] By the same logic, his common law claim for unjust enrichment, which is essentially an action for restitution (see *Lauriedale Associates Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448 [9 Cal.Rptr.2d 774]), is also arbitrable.

■ Finally, we note that when there is a severance of arbitrable from inarbitrable claims, the trial court has the discretion to stay proceedings on the inarbitrable claims pending resolution of the arbitration. (Code Civ. Proc., § 1281.4; *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 714 [131 Cal.Rptr. 882, 552 P.2d 1178].) We agree with the Court of Appeal in *Coast Plaza Doctors Hospital v. Blue Cross of California, supra,* 83 Cal.App.4th at page 693, that such a stay is generally in order under these circumstances. "A stay is appropriate where '[i]n the absence of a stay, the continuation of the proceedings in the trial court disrupts the arbitration proceedings and can render them ineffective.' " (*Ibid.*)[8]

---

[6]Although we do not agree with amici curiae that *Waffle House* requires us to extend *Broughton*, neither do we agree with Justice Chin's concurring and dissenting opinion that the former case requires us to overrule the latter. (Conc. & dis. opn. of Chin, J., *post*, at p. 335.) As we have discussed, *Waffle House* recognizes that the EEOC's action on behalf of parties to an arbitration agreement in order to vindicate the public interest is not confined to injunctions, but can encompass the full range of victim-specific relief. But it does not follow, either logically or intuitively, that all forms of relief must therefore be arbitrable for private parties bound by arbitration agreements. For reasons explained above, and in *Broughton*, we hold that for consumers bound by arbitration agreements, public injunctions are inarbitrable. Nothing in *Waffle House* contradicts or calls into question that conclusion. If anything, *Waffle House* suggests the Supreme Court's agreement that a party acting *entirely* on behalf of the public—in the EEOC's case in all of its actions and in Cruz's case when he pursues a public injunction—acts beyond the scope of any arbitration agreement.

[7]The question whether someone who is not a party to an arbitration agreement may bring a representative action pursuant to Business and Professions Code section 17204 for restitution on behalf of injured consumers who are parties to the arbitration agreement is one that is not before us, and about which we express no opinion.

[8]In his brief, Cruz argues for the first time that under an FAA exemption established by the federal McCarran-Ferguson Act (15 U.S.C. § 1011 et seq.), the FAA does not apply to the

## III. Disposition

Although Cruz's monetary equitable relief claims are not inherently inarbitrable, he contends, as noted, that the arbitration agreement should not be enforced for other reasons, such as because his claims are outside the scope of the arbitration agreement and because the agreement is unconscionable. The trial court, holding all of the claims inarbitrable per se, did not address these contentions. These objections to arbitration may be reasserted on remand.

The judgment of the Court of Appeal is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., and Reardon, J.,* concurred.

**BAXTER, J.,** Concurring and Dissenting.—The Federal Arbitration Act (9 U.S.C. § 1 et seq. (FAA)) evinces a supreme and preemptive federal policy favoring the enforcement of arbitration agreements involving interstate commerce. In *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*), this court articulated the principle that, notwithstanding the FAA, California may act in contravention of that policy by requiring a judicial forum for public injunction requests that parties contracting in interstate commerce have agreed to resolve by arbitration. There we held that claims by one party against another for public injunctive relief under our state's Consumers Legal Remedies Act (CLRA) were inarbitrable despite the parties' agreement to arbitrate all their disputes.

I joined the majority opinion in *Broughton, supra,* 21 Cal.4th 1066. But as Justice Chin cogently and compellingly explains in his concurring and dissenting opinion herein, *Broughton*'s reasoning has been undermined by three subsequent decisions of the United States Supreme Court: *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279 [122 S.Ct. 754, 151 L.Ed.2d 755]; *Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105 [121 S.Ct. 1302, 149 L.Ed.2d 234]; and *Green Tree Fin. Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [121 S.Ct. 513, 148 L.Ed.2d 373]. Accordingly, while I concur fully in the majority's conclusion here that plaintiff Jose E. Cruz's claims for restitution, disgorgement, and unjust enrichment are arbitrable pursuant to the parties' agreement, I cannot join in its determination to follow and extend *Broughton* to bar arbitration of plaintiff's requests for injunctive

---

arbitration agreement in this case. We decline to address this argument because Cruz failed to raise it below. (See Cal. Rules of Court, rule 29(b)(1); *People v. Slayton* (2001) 26 Cal.4th 1076, 1083 [112 Cal.Rptr.2d 561, 32 P.3d 1073].)

*Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

relief under the CLRA, the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and Business and Professions Code section 17500.

Not only do the recent Supreme Court authorities cast grave doubt on *Broughton*'s legal analysis and conclusion, but as Justice Chin also points out, claims under the UCL are easily alleged in the context of business activities. (Conc. & dis. opn. of Chin, J., *post*, at p. 339.) Therefore, extending *Broughton* to UCL injunctive relief requests will surely frustrate the legitimate contract expectations of a great many who seek to secure the benefits of a nonjudicial forum for resolving their disputes. Indeed, virtually every lawsuit involving a business entity will be subject to compounded costs and delayed resolution of claims when bifurcated litigation of the suit proceeds one part after the other in dual fora: first, an arbitration proceeding in which any UCL-based restitution, disgorgement, and unjust enrichment claims and any non-UCL damages claims are resolved; and second, a judicial action in which the UCL claims seeking public injunctive relief are litigated. (See maj. opn., *ante*, at p. 320.) This additional consideration is a paramount one that further contributed to my reevaluation of *Broughton*.

For all the foregoing reasons, I hereby dissent from the majority's decision that plaintiff's requests for injunctive relief are inarbitrable.

**CHIN, J.,** Concurring and Dissenting.—I concur in the majority's holding that the claims of plaintiff Jose E. Cruz for restitution, disgorgement, and unjust enrichment are arbitrable. However, I dissent from the majority's decision to follow and extend *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 [90 Cal.Rptr.2d 334, 988 P.2d 67] (*Broughton*), in holding that Cruz's requests for injunctive relief under the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.), the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and Business and Professions Code section 17500 are not arbitrable. *Broughton*'s holding that CLRA claims for so-called public injunctive relief are not arbitrable is inconsistent and incompatible with the United States Supreme Court's binding construction of the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) in three post-*Broughton* decisions: *Circuit City Stores, Inc. v. Adams* (2001) 532 U.S. 105 [121 S.Ct. 1302, 149 L.Ed.2d 234] (*Circuit City*), *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279, 294-296 [122 S.Ct. 754, 151 L.Ed.2d 755] (*Waffle House*), and *Green Tree Fin. Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [121 S.Ct. 513, 148 L.Ed.2d 373] (*Green Tree*). Moreover, given the ease with which a plaintiff may allege a claim under the UCL, the majority's extension of *Broughton* to UCL claims destroys the enforceability of arbitration agreements and eviscerates the public policy—expressly established by both the California Legislature and the United States Congress—that strongly favors enforcement of arbitration agreements according to their terms. Finally, the

majority sacrifices this public policy for no good reason; even if we hold an individual plaintiff to his or her agreement to arbitrate, under this court's prior construction of the UCL, the Attorney General of California and any other California citizen who has not signed an arbitration agreement may bring a court action for injunctive relief to protect the public and vindicate the public interest in enforcement of the statutes here in question.

## I. THE FAA PREEMPTS STATE LAWS THAT LIMIT THE ENFORCEABILITY OF ARBITRATION AGREEMENTS.

In enacting the FAA, Congress "intended to 'revers[e] centuries of judicial hostility to arbitration agreements,' [citation], by 'plac[ing] [them] "upon the same footing as other contracts." ' " (*Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 225-226 [107 S.Ct. 2332, 2337, 96 L.Ed.2d 185].) Section 2 of the FAA provides: "A written provision in . . . a contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) This provision "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms" (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S.Ct. 1248, 1255, 103 L.Ed.2d 488] (*Volt*)), and "mandates enforcement of agreements to arbitrate," even if they include "statutory claims." (*Shearson, supra*, 482 U.S. at p. 226 [107 S.Ct. at p. 2337].) "The 'liberal federal policy favoring arbitration agreements,' [citation], manifested by this provision and the [FAA] as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the [FAA] simply 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.' [Citation.]" (*Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625 [105 S.Ct. 3346, 3353, 87 L.Ed.2d 444], fn. omitted.)

The United States Supreme Court has demonstrated the primacy and scope of this duty by repeatedly invalidating, under the supremacy clause of the federal Constitution, state laws that attempt to limit the enforceability of arbitration agreements.[1] In invalidating these state laws, the high court has explained that section 2 of the FAA " 'is a congressional declaration of a

---

[1] *Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58 [115 S.Ct. 1212, 1216, 131 L.Ed.2d 76] (*Mastrobuono*) (FAA preempts New York prohibition against arbitrating punitive damages); *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 268-277 [115 S.Ct. 834, 836-841, 130 L.Ed.2d 753] (*Allied-Bruce*) (FAA preempts Alabama statute making predispute arbitration agreements unenforceable); *Perry v. Thomas* (1987) 482 U.S. 483, 489 [107 S.Ct. 2520, 2525, 96 L.Ed.2d 426] (*Perry*) (FAA preempts California statute prohibiting arbitration of wage collection actions); *Southland Corp. v. Keating* (1984) 465

liberal federal policy favoring arbitration agreements, *notwithstanding any state substantive or procedural policies to the contrary.*' " (*Perry, supra,* 482 U.S. at p. 489 [107 S.Ct. at p. 2525], italics added.) According to the court, in enacting section 2 of the FAA, Congress "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration" (*Southland, supra,* 465 U.S. at p. 10 [104 S.Ct. at p. 858]) in order "to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." (*Id.* at p. 16 [104 S.Ct. at p. 861], fn. omitted.) Thus, "the FAA ensures" that an agreement to arbitrate specified claims "will be enforced according to its terms *even if a rule of state law would otherwise exclude such claims from arbitration.*" (*Mastrobuono, supra,* 514 U.S. at p. 58 [115 S.Ct. at p. 1216], italics added.) "[A]*ny* . . . state policy" that purports to invalidate an arbitration clause in a contract that is otherwise enforceable under state law is "*unlawful,* for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA's] language and Congress' intent. [Citation.]" (*Allied-Bruce, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843], italics added.) In short, under the high court's binding construction of federal law, "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' [Citation.]" (*Volt, supra,* 489 U.S. at p. 478 [109 S.Ct. at p. 1255].) Accordingly, "state courts cannot apply state statutes that invalidate arbitration agreements" to which the FAA applies.[2] (*Allied-Bruce, supra,* 513 U.S. at p. 272 [115 S.Ct. at p. 838].)

## II. *Broughton* Manufactures an Exception to the Rule of FAA Preemption.

In *Broughton,* the plaintiffs sued a defendant that had provided them with health care coverage. (*Broughton, supra,* 21 Cal.4th at p. 1072.) They alleged in part that the defendant had violated the CLRA by deceptively advertising the quality of medical services provided under its health plan. (*Broughton, supra,* 21 Cal.4th at p. 1072.) They requested actual damages, punitive damages, and an order enjoining the defendant's deceptive conduct. (*Ibid.*)

U.S. 1, 10 [104 S.Ct. 852, 858, 79 L.Ed.2d 1] (*Southland*) (FAA preempts California statute prohibiting arbitration of claims under the California Franchise Investment Law).

[2] States "may," however, "regulate contracts, including arbitration clauses, under general contract law principles," and thus "may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' [Citation.]" (*Allied-Bruce, supra,* 513 U.S. at p. 281 [115 S.Ct. at p. 843].) "Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of [the FAA]. [Citations.]" (*Perry, supra,* 482 U.S. at p. 493, fn. 9 [107 S.Ct. at p. 2527].)

The defendant moved to compel arbitration, relying on a mandatory arbitration clause in its combined evidence of coverage and disclosure form. (*Ibid.*) The superior court denied the motion as to the CLRA claim. (*Ibid.*)

In a closely divided decision, a four-justice majority of this court affirmed the superior court's decision insofar as it declined to order arbitration of the plaintiffs' request for an injunction under the CLRA. (*Broughton, supra,* 21 Cal.4th at pp. 1073-1084.) The majority opinion in *Broughton* concluded the California Legislature "did not intend" that requests under the CLRA for "this type of injunctive relief . . . be arbitrated." (*Id.* at p. 1080.) This conclusion rested on "two factors." (*Id.* at p. 1082.) First, according to *Broughton,* "the evident purpose of the [CLRA's] injunctive relief provision . . . is . . . to remedy a public wrong" and to protect "the general public" from "being victimized by the same deceptive practices as the plaintiff suffered," not to "compensat[e]" the plaintiff who brings and pursues the CLRA claim. (*Id.* at p. 1080.) "In other words," *Broughton* continued, "the plaintiff in a CLRA damages action is playing the role of a bona fide private attorney general. [Citation.]" (*Ibid.*) Second, *Broughton* found that private arbitration is "inherent[ly] unsuitabl[e] . . . as a means of resolving" CLRA injunction requests. (*Id.* at p. 1088.) *Broughton* based this finding on the view that "private arbitration" has several "institutional shortcomings . . . in the field of such public injunctions," specifically: (1) arbitrators are not "accountable to the public"; (2) "continuing supervision of an injunction" is problematic because arbitrators "are not necessarily bound by earlier decisions of other arbitrators in the same case" and are "unconstrained by judicial review"; (3) "an arbitration award does not have collateral estoppel effect in favor of nonparties to an arbitration unless the arbitral parties so agree"; and (4) "modification or vacation of [arbitral] injunctions involves the cumbersome process of initiating a new arbitration proceeding." (*Id.* at p. 1081.) According to *Broughton,* these "two factors taken in combination . . . make for an 'inherent conflict' between arbitration and the underlying purpose of the CLRA's injunctive relief remedy." (*Id.* at p. 1082.) Based on this "inherent conflict," *Broughton* "presume[d] . . . the Legislature did not intend that [CLRA] injunctive relief claims be arbitrated," and found no "indications" of a contrary legislative intent to overcome this presumption. (*Ibid.*) In reaching this conclusion, *Broughton* held that despite the express statutory declaration in Code of Civil Procedure section 1281 that arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract," the Legislature "may express its intention to make a statutory right inarbitrable . . . implicitly in those rare circumstances in which the fulfillment of the statutory purpose inherently conflicts with arbitration." (*Broughton, supra,* 21 Cal.4th at p. 1082, fn. 7.)

*Broughton* next found that this construction of the CLRA, although invalidating agreements to arbitrate CLRA injunction requests, did not violate the

FAA. (*Broughton, supra,* 21 Cal.4th at pp. 1082-1084.) Relying on *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20 [111 S.Ct. 1647, 114 L.Ed.2d 26] (*Gilmer*), *Broughton* concluded that despite the FAA, a court may invalidate an arbitration agreement if it finds, based on an " 'inherent conflict' " between arbitration and a *state* statutory right or remedy, that the state legislature intended to prohibit arbitration of claims involving that state right or remedy. (*Broughton, supra,* 21 Cal.4th at pp. 1082-1083.) *Broughton* acknowledged that the high court had "recognize[d] an 'inherent conflict' exception" to the FAA only with respect to "*federal* statutory claims," and that *Gilmer* and the other high court cases discussing that exception "occurred in the context of an inquiry into whether *Congress* had intended federal statutory claims to be exempt from arbitration." (*Ibid.,* first italics added.) Citing *Southland, Broughton* also recognized that "the [high] court has stated generally that the capacity to withdraw statutory rights from the scope of arbitration agreements is the prerogative solely of Congress, not state courts or legislatures [citation] . . . ." (*Broughton, supra,* 21 Cal.4th at p. 1083.) Nevertheless, according to *Broughton,* the high court's FAA preemption decisions "ha[d] never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests." (*Ibid.*) *Broughton* also reasoned that "it would be perverse to extend the policy [of the FAA] so far as to preclude states from passing legislation the purposes of which make it incompatible with arbitration . . . ." (*Ibid.*) Finally, *Broughton* reasoned that the "inappropriateness" of arbitration as a means for resolving certain "private attorney general actions . . . does not turn on the happenstance of whether the rights and remedies being adjudicated are of state or federal derivation." (*Ibid.*) *Broughton* thus concluded that notwithstanding the high court's pronouncement that "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration' " (*Volt, supra,* 489 U.S. at p. 478 [109 S.Ct. at p. 1255]), state legislatures and state courts may require a judicial forum for public injunction requests that contracting parties have agreed to resolve by arbitration.

Though invalidating agreements to arbitrate CLRA injunction requests, *Broughton* also held that agreements to arbitrate CLRA claims for damages are enforceable, "at least to the extent the FAA governs such claims." (*Broughton, supra,* 21 Cal.4th at p. 1084.) *Broughton* stated that the CLRA "might be interpreted" as requiring that CLRA damage claims "be resolved solely in a judicial forum." (*Ibid.*) However, *Broughton* also explained: "[A]s [the high court's decisions] make clear, statutory damages claims are fully arbitrable [under the FAA]. Such an action is primarily for the benefit of a party to the arbitration, even if the action incidentally vindicates important

public interests. [Citation.] In the context of statutory damages claims, the [high court] has consistently rejected [the] arguments that abbreviated discovery, arbitration's inability to establish binding precedent, and a plaintiff's right to a jury trial render the arbitral forum inadequate, or that submission of resolution of the claims to arbitration is in any sense a waiver of the substantive rights afforded by statute. [Citations.] 'By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' [Citation.]" (*Ibid.*) "Thus," in order to make the CLRA "consistent with the FAA," *Broughton* "interpret[ed] the CLRA as permitting arbitration of damages claims, at least to the extent the FAA governs such claims." (*Ibid.*)

### III.   THE HIGH COURT'S POST-*BROUGHTON* DECISIONS REQUIRE THAT WE OVERRULE *BROUGHTON*.

Since we decided *Broughton*, the high court has issued three relevant arbitration decisions. The high court's statements in these three decisions require us to overrule *Broughton*'s holding that California may prohibit enforcement of agreements to arbitrate CLRA requests for public injunctions.

The first decision—*Circuit City*—directly refutes one of *Broughton*'s critical premises: that *Gilmer*'s "inherent conflict" exception to the FAA may apply based on the intent of a *state* legislature—as opposed to Congress— and that a state legislature therefore may, notwithstanding the FAA, prohibit enforcement of an arbitration agreement where the legislature concludes that arbitration inherently conflicts with a statutory right or remedy. In *Circuit City*, the high court construed the FAA to apply to "all contracts of employment" except those of "transportation workers." (*Circuit City, supra,* 532 U.S. at p. 109 [121 S.Ct. at p. 1306].) Opposing this conclusion, "[v]arious *amici*, including the attorneys general of 21 States," argued that this broad construction of the FAA would "intrude[] upon the policies of the separate States" by "effect[ively] pre-empt[ing] . . . state employment laws [that] restrict or limit the ability of employees and employers to enter into arbitration agreements." (*Id.* at pp. 121-122 [121 S.Ct. at p. 1312].) Amici curiae contended "that States should be permitted, pursuant to their traditional role in regulating employment relationships, to prohibit employees . . . from contracting away their right to pursue state-law discrimination claims in court." (*Id.* at p. 122 [121 S.Ct. at p. 1312].) The high court responded that under *Gilmer*, arbitration agreements in employment contracts "can be enforced under the FAA without contravening the policies of *congressional* enactments giving employees specific protection against discrimination prohibited by federal law." (*Circuit City, supra,* 532 U.S. at p. 123 [121 S.Ct. at

p. 1313], italics added.) As for the policies of *state* laws, the court found them irrelevant under *Southland*'s holding "that Congress intended the FAA . . . to pre-empt state antiarbitration laws to the contrary. [Citation.]" (*Circuit City, supra,* 532 U.S. at p. 122 [121 S.Ct. at p. 1312]; see also *id.* at p. 112 [*Southland* held that the FAA is "pre-emptive of state laws hostile to arbitration"].) The court also declared that courts may "not chip away at *Southland* by indirection." (*Circuit City, supra,* 532 U.S. at p. 122.) Thus, *Circuit City* holds that we may not, as *Broughton* did, chip away at *Southland* by applying *Gilmer*'s exemption analysis, including the "inherent conflict" exception, based on the intent or policies of a *state* legislature. Under *Circuit City,* only "the policies of *congressional* enactments" are relevant to this analysis; state policies are simply irrelevant unless, as the FAA provides, they establish grounds as exist at law or in equity for the revocation of any contract. (*Circuit City, supra,* 532 U.S. at p. 123 [121 S.Ct. at p. 1313], italics added.)

*Circuit City* also undermines *Broughton*'s analysis and conclusion in another important respect. As I have explained, amici curiae in *Circuit City* argued for a construction of the FAA that would leave states free to prohibit employees from contracting away their right to a judicial forum for resolving discrimination claims under state law. (*Circuit City, supra,* 532 U.S. at pp. 121-122 [121 S.Ct. at p. 1312].) In rejecting this argument, the high court reasoned in part that amici curiae's construction would enable states to deprive parties of the "real benefits to the enforcement of arbitration provisions." (*Id.* at pp. 122-123 [121 S.Ct. at pp. 1312-1313].) "Arbitration," the court explained, "allow[s] parties to avoid the costs of litigation . . . . These litigation costs . . . would be compounded by the difficult choice-of-law questions that are often presented in disputes arising from the employment relationship [citation], and the necessity of bifurcation of proceedings in those cases where state law precludes arbitration of certain types of employment claims but not others." (*Id.* at p. 123 [121 S.Ct. at p. 1313].) The court also explained that amici curiae's construction would produce "considerable complexity and uncertainty" regarding "the enforceability of arbitration agreements in employment contracts," which "would call into doubt the efficacy of alternative dispute resolution procedures adopted by many of the Nation's employers, in the process undermining the FAA's proarbitration purposes and 'breeding litigation from a statute that seeks to avoid it.' [Citation.]" (*Ibid.*) As both *Broughton* and the case now before us amply demonstrate, *Broughton*'s holding produces precisely these effects; it deprives parties of the benefits of arbitration, necessitates bifurcated proceedings and compounds litigation costs, and creates both complexity and uncertainty regarding the enforceability of arbitration agreements, thereby placing in doubt arbitration's efficacy as an alternative dispute resolution

procedure, "undermining the FAA's proarbitration purposes and 'breeding litigation from a statute that seeks to avoid it.' [Citation.]" (*Circuit City, supra,* 532 U.S. at p. 123 [121 S.Ct. at p. 1313].)

The majority here errs in asserting that because *Circuit City* "was principally concerned with" the construction of section 1 of the FAA, whereas *Broughton* involved "the preemptive scope of section 2," *Circuit City* has "little if any bearing on" *Broughton.* (Maj. opn., *ante,* at p. 314.) First and foremost, as I have explained, *Circuit City* expressly relied on "the preemptive scope of section 2" (maj. opn., *ante,* at p. 314) in rejecting the argument that the high court should construe the FAA so as to leave states free to implement their own "policies" regarding the nonarbitrability of discrimination claims under state law. (*Circuit City, supra,* 532 U.S. at pp. 121-122 [121 S.Ct. at p. 1312].) Again, the high court found the argument foreclosed by *Southland*'s holding—reaffirmed in *Allied-Bruce*—that section 2 of the FAA "pre-empt[s] state antiarbitration laws." (*Circuit City, supra,* 532 U.S. at p. 122 [121 S.Ct. at p. 1312].) Second, the high court based its construction of section 1 on the language and judicial construction of section 2. Regarding the former, the court contrasted the expansive language of section 2 with the narrower language of section 1. (*Circuit City, supra,* 532 U.S. at pp. 115, 117-118 [121 S.Ct. at pp. 1309, 1310].) Regarding the latter, the court explained that the plaintiff's broad reading of section 1 was inconsistent with the court's "expansive reading of § 2." (*Circuit City, supra,* 532 U.S. at p. 119 [121 S.Ct. at p. 1311].) The court reasoned that the plaintiff's construction of section 1 would deprive parties of the arbitration benefits that section 2 confers and, by creating "considerable complexity and uncertainty" regarding "the enforceability of arbitration agreements," would "undermin[e]" section 2's "proarbitration purposes." (*Circuit City, supra,* 532 U.S. at p. 123 [121 S.Ct. at p. 1313].) The court also explained that "it would be incongruous to adopt" a reading of section 1 that would "undo" the broad "coverage in § 2" that "implement[s] proarbitration policies." (*Circuit City, supra,* 532 U.S. at p. 122 [121 S.Ct. at p. 1313].) Third, the plaintiff's argument in *Circuit City* regarding section 1 was premised on the high court's "construction of § 2's coverage provision." (*Circuit City, supra,* 532 U.S. at p. 114 [121 S. Ct. at p. 1308.) Fourth, and finally, before even discussing the scope of section 1, the high court considered, and rejected, the plaintiff's argument regarding the "construction of § 2," i.e., that section 2 of the FAA did not apply because "an employment contract is not a 'contract evidencing a transaction involving interstate commerce' " within the meaning of section 2. (*Circuit City, supra,* 532 U.S. at p. 113 [121 S.Ct. at p. 1308].) Thus, the majority errs in asserting that section 2 of the FAA—and specifically its "preemptive scope" (maj. opn., *ante,* at p. 314)— were not critical components of the high court's opinion in *Circuit City.*

The majority also errs in asserting that *Circuit City* does not "shed any further light on the 'inherently incompatible' exception to arbitrability." (Maj. opn., *ante,* at p. 314.) In *Circuit City,* the attorneys general essentially argued that arbitration is inherently incompatible with state statutes that "prohibit employees . . . from contracting away their right to pursue state-law discrimination claims in court," and that requiring arbitration of these claims would "intrude[] upon the policies of the separate States" reflected in these statutes. (*Circuit City, supra,* 532 U.S. at pp. 121-122 [121 S.Ct. at p. 1312].) As I have explained, in rejecting this argument, the court held that whereas *Gilmer*—which sets forth the inherent conflict analysis *Broughton* adopted—"involved a federal statute" and thus governs enforcement of agreements to arbitrate claims *under federal law* (*Circuit City, supra,* 532 U.S. at pp. 123-124 [121 S.Ct. at pp. 1313-1314]), enforcement of agreements to arbitrate claims *under state law* is both governed *and required* by *Southland*'s holding that the FAA "pre-empt[s] state antiarbitration laws." (*Id.* at p. 122 [121 S.Ct. at p. 1312].) Thus, *Circuit City* establishes that an exception to the FAA may not be based on a *state's* view that arbitration is inherently incompatible with some *state* policy.

In this regard, *Circuit City* is consistent with another high court decision that *Broughton* completely ignored: *Mastrobuono.* There, the high court held that the FAA preempts a New York rule prohibiting an arbitrator from awarding punitive damages even where an arbitration agreement authorizes the award. (*Mastrobuono, supra,* 514 U.S. at pp. 53-58 [115 S.Ct. at pp. 1214-1217].) New York established this rule based on its view that punitive damages are exemplary social remedies intended to punish and deter, not to compensate, and that as a matter of strong public policy, only the state—and not private arbitrators—may wield the power to punish. (*Garrity v. Lyle Stuart, Inc.* (1976) 40 N.Y.2d 354 [386 N.Y.S.2d 831, 832-835, 353 N.E.2d 793, 794-797, 83 A.L.R.3d 1024] (*Garrity*).) According to the state's highest court, New York's public policy requires " 'rather close judicial supervision' " in the administration of this public penal sanction and, contrary to this public policy, " 'there [is] no effective judicial supervision over punitive awards in arbitration.' " (*Id.* at p. 834 [353 N.E.2d at pp. 796-797].) In finding that the FAA preempts the New York rule, the high court explained that under its prior decisions, "if contracting parties agree to *include* claims for punitive damages within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms *even if a rule of state law would otherwise exclude such claims from arbitration.*" (*Mastrobuono, supra,* 514 U.S. at p. 58 [115 S.Ct. at p. 1216], italics added.) Therefore, "in the absence of contractual intent to the contrary, the FAA would pre-empt the [New York] rule," despite its basis in the state's public policy. (*Mastrobuono, supra,* 514 U.S. at p. 59 [115 S.Ct. at p. 1217].) According to the

high court, the question thus came "down to what the *contract*"—not New York law—"ha[d] to say about the arbitrability of [the] claim for punitive damages." (*Id.* at p. 58 [115 S.Ct. at p. 1216], italics added.) The court found that "[a]t most," one contractual provision "introduce[d] an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." (*Id.* at p. 62 [115 S.Ct. at p. 1218].) Explaining that the FAA requires resolution of such ambiguities in favor of arbitration, the court read the arbitration agreement to permit arbitration of a punitive damages claim and it ordered enforcement of the arbitrator's award of punitive damages notwithstanding New York's law precluding such an award. (*Mastrobuono, supra,* 514 U.S. at pp. 62-64 [115 S.Ct. at p. pp. 1218-1219].)

*Mastrobuono,* which *Broughton* did not consider or even cite, undermines *Broughton*'s analysis and conclusion in several critical respects. First, it directly contradicts *Broughton*'s statement that the high court "ha[d] never directly decided whether a legislature may restrict a private arbitration agreement when it inherently conflicts with a public statutory purpose that transcends private interests." (*Broughton, supra,* 21 Cal.4th at p. 1083.) Second, it directly refutes *Broughton*'s view that arbitration of CLRA injunction requests is impermissible because of the need for continuing judicial supervision of CLRA injunctions. (*Broughton, supra,* 21 Cal.4th at p. 1081.) Finally, and perhaps most importantly, *Mastrobuono* directly refutes the fundamental premise of *Broughton*'s analysis: that the high court cases leave *states* free to prohibit arbitration of a *state* remedy if "the primary purpose and effect of" that remedy is to protect the public, "not to compensate for an individual wrong." (*Broughton, supra,* 21 Cal.4th at p. 1077.) In the high court's view, "by definition," the purpose of punitive damages is "not . . . to compensate the injured party, but rather to punish the tortfeasor" (*Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 266 [101 S.Ct. 2748, 2759, 69 L.Ed.2d 616]) and to " 'protect[] the public by [deterring] the defendant and others from doing such wrong in the future.' [Citation.]" (*Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1, 19 [111 S.Ct. 1032, 1044, 113 L.Ed.2d 1].) Given the court's view that the purpose of punitive damages is to protect the public and *not* to compensate the victim in any sense, *Mastrobuono*'s invalidation of New York's rule against arbitration of punitive damages clearly established that the FAA preempts state laws prohibiting arbitration of such public, noncompensatory remedies.

The majority errs in suggesting that *Broughton* can be reconciled with *Mastrobuono* because punitive damages are different from public injunctions in some relevant sense. (Maj. opn., *ante,* at 312, fn. 1.) Consistent with the high court's view, we have explained that the "purpose" of a punitive damages award "is a purely *public* one"—"to punish wrongdoing and

thereby to protect [the public] from future misconduct, either by the same defendant or other potential wrongdoers. [Citation.]" (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348], fn. omitted (*Adams*).) Thus, under existing California law, punitive damages have the same "primary purpose and effect" that, according to *Broughton*, public injunctions have: "not to compensate for an individual wrong but to prohibit and enjoin conduct injurious to the general public." (*Broughton, supra*, 21 Cal.4th at p. 1077.) As the preceding quote demonstrates, *Broughton* held that arbitrability depends not, as the majority suggests, on whether a remedy "confer[s] a direct benefit on the plaintiff[]" (maj. opn., *ante*, at p. 313, fn. 1), but on whether "the primary purpose and effect of" the remedy is "to compensate for an individual wrong" or "to prohibit and enjoin conduct injurious to the general public." (*Broughton, supra*, 21 Cal.4th at p. 1077.) Applying this test, *Broughton* held that CLRA requests for public injunctions are inarbitrable because such relief is "designed for the protection of the general public." (*Broughton, supra*, 21 Cal.4th at p. 1083.) *Broughton*'s analysis and conclusion are clearly irreconcilable with *Mastrobuono*, which held that requests for punitive damages are arbitrable *even though* their *sole* purpose is to protect the public and *not* to compensate the victim in any sense. Thus, that this case involves a request for injunctive relief rather than punitive damages is not a valid basis for distinguishing *Mastrobuono*. Indeed, as I later explain in more detail, the high court rejected this very distinction in its post-*Broughton* decision in *Waffle House*.[3]

The majority's attempt to distinguish *Mastrobuono* fails for an additional reason. The majority suggests that regarding " 'judicial supervision' " in

---

[3]The majority also errs in asserting that punitive damages "are in principle little different from . . . treble damages antitrust awards." (Maj. opn., *ante*, at p. 313, fn. 1.) According to the high court, the antitrust treble damages provision "is in essence a *remedial* provision." (*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 485 [97 S.Ct. 690, 695-696, 50 L.Ed.2d 701], italics added.) Congress "created" it "*primarily as a remedy for the victims* of antitrust violations." (*American Soc. of M. E.'s v. Hydrolevel Corp.* (1982) 456 U.S. 556, 575 [102 S.Ct. 1935, 1947, 72 L.Ed.2d 330], italics added.) Treble damages " 'make the *remedy* meaningful by counter-balancing "the difficulty of maintaining a private suit" ' under the antitrust laws. [Citation.]" (*Ibid.*, italics added.) Based on the fact that antitrust treble damages, unlike punitive damages, "serve as a means . . . *of compensating victims*," the high court has held that limitations on recovery of punitive damages do *not* apply to recovery of antitrust treble damages. (*Id.* at pp. 575-576 [102 S.Ct. at p. 1947, italics added.) Thus, the high court has rejected the majority's view that punitive damages and antitrust treble damages are the same "in principle." (Maj. opn., *ante*, at p. 313, fn. 1.) Our prior decisions also reject the majority's view; they distinguish between punitive damages, which serve a "purely *public*" function (*Adams, supra*, 54 Cal.3d at p. 110), and antitrust treble damages, which principally provide "private *compensation*" and only "incidental[ly]" confer a "public benefit." (*Broughton, supra*, 21 Cal.4th at p. 1080, fn. omitted, italics added.) New York decisions draw a similar distinction. (*Garrity, supra*, 386 N.Y.S.2d at p. 833 [353 N.E.2d at p. 795].)

arbitration, the New York rule at issue in *Mastrobuono* was premised on the inadequacy of "judicial and appellate review," whereas *Broughton* was premised on the "monitoring, enforcement, and modification that is required of public injunctions." (Maj. opn., *ante*, at p. 313, fn. 1.) However, *Broughton*'s discussion of this subject stressed the fact that "[a]rbitrators" are "unconstrained by judicial review" and "are not necessarily bound by earlier decisions of other arbitrators in the same case." (*Broughton, supra,* 21 Cal.4th at p. 1081.) Thus, for several reasons, the majority's attempt to distinguish *Mastrobuono* is unpersuasive.

In *Circuit City* and *Mastrobuono*, the high court simply applied the general constitutional rule regarding the supremacy of federal law specifically in the arbitration context. The supremacy clause of the United States Constitution (U.S. Const., art. VI, cl. 2) "invalidates *all* state laws that conflict or interfere with an Act of Congress. [Citations.]" (*Rose v. Arkansas State Police* (1986) 479 U.S. 1, 3 [107 S.Ct. 334, 335, 93 L.Ed.2d 183], italics added.) According to the high court, this rule applies regardless of the magnitude or nature of the public policy the state law seeks to implement. "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our [federal] Constitution provided [in the supremacy clause] that the federal law must prevail. [Citation.]" (*Free v. Bland* (1962) 369 U.S. 663, 666 [82 S.Ct. 1089, 1092, 8 L.Ed.2d 180].) Thus, the proper "inquiry" is "whether there is a conflict" between the state law and federal law, not the significance of the state public policy at issue. (*Ibid.*; see also *Fidelity Federal Sav. & Loan Assn. v. De La Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] [federal preemption under the supremacy clause applies even though "real property law is a matter of special concern to the States"].) *Broughton*'s reliance on the importance of the public interest at stake when a plaintiff seeks a CLRA injunction is inconsistent with these binding high court precedents and pronouncements. Regardless of the state's interest, a "state statute [that] authorizes the precise conduct that Congress sought to prohibit . . . is repugnant to the [s]upremacy [c]lause." (*Rose v. Arkansas State Police, supra,* 479 U.S. at p. 4 [107 S.Ct. at p. 335].) Thus, under *Broughton*, the CLRA is repugnant to the supremacy clause—and is therefore invalid—insofar as it authorizes California courts to do precisely what the FAA prohibits: invalidate FAA-governed agreements to arbitrate requests for CLRA injunctions on grounds other than those that exist at law or in equity for the revocation of any contract. In short, *Mastrobuono* and the high court's post-*Broughton* decision in *Circuit City*, consistent with and following the high court's supremacy clause jurisprudence, refute a foundational assumption of *Broughton*'s analysis: that states may create FAA exceptions for public policy reasons.

Indeed, *Mastrobuono* takes on increased importance with respect to this issue in light of the high court's second relevant post-*Broughton* decision in *Waffle House*, which held that under the FAA, there is no difference in terms of arbitrability between requests for public injunctive relief and requests for compensatory or punitive damages. In *Waffle House*, the Equal Employment Opportunity Commission (EEOC) filed a discrimination action under the Americans With Disabilities Act "both in the public interest and on behalf of" the specific victim of the discrimination, who had signed an arbitration agreement with the defendant. (*Waffle House, supra*, 534 U.S. at p. 284 [122 S.Ct. at p. 759].) The complaint requested "injunctive relief to 'eradicate the effects of [the defendant's] past and present unlawful employment practices'" and "specific relief designed to make [the victim] whole, including backpay, . . . compensatory damages, and . . . punitive damages . . . ." (*Id.* at pp. 283-284 [122 S.Ct. at p. 759].) The court of appeals held that the victim's arbitration agreement "precluded [the EEOC] from seeking victim-specific relief in court," but not from seeking "'large-scale injunctive relief.'" (*Id.* at p. 284 [122 S.Ct. at p. 759].) In so "distinguish[ing] between injunctive and victim-specific relief," the court of appeals concluded that "the EEOC is barred from obtaining the latter because any public interest served when the EEOC pursues 'make whole' relief is outweighed by the policy goals favoring arbitration." (*Id.* at p. 290 [122 S.Ct. at p. 762].) However, the court of appeals reasoned, "when the EEOC seeks broad injunctive relief, . . . the public interest overcome[s] the goals underpinning the FAA." (*Ibid.*, fn. omitted.)

The high court in *Waffle House* held that under the FAA, a distinction in terms of arbitrability between requests for broad, large-scale injunctive relief to protect the public and requests for monetary relief, including punitive damages, is invalid. (*Waffle House, supra*, 534 U.S. at pp. 294-296 [122 S.Ct. at pp. 764-765].) The court explained that this distinction does not serve "its avowed purpose of preserving the EEOC's public function while favoring arbitration. For that purpose, the category of victim-specific relief is both overinclusive and underinclusive. For example, it is overinclusive because . . . punitive damages . . . serve an obvious public function in deterring future violations. [Citations.] Punitive damages may often have a greater impact on the behavior of other employers than the threat of an injunction, yet the EEOC is precluded from seeking this form of relief under the Court of Appeals' compromise scheme. And, it is underinclusive because injunctive relief, although seemingly not 'victim-specific,' can be seen as more closely tied to the employees' injury than to any public interest." (*Id.* at pp. 294-295 [122 S.Ct. at pp. 764-765].) "'While injunctive relief may appear more "broad based," it nonetheless is redress for individuals.'" (*Id.* at p. 295 [122 S.Ct. at p. 765].) Thus, the court held, "if the [FAA's] policy

favoring arbitration trumps the plain language of Title VII and the contract, the EEOC should be barred from pursuing any claim outside the arbitral forum. If not, then the statutory language is clear; the EEOC has the authority to pursue victim-specific relief regardless of the forum that the employer and employee have chosen to resolve their disputes." (*Ibid.*) The high court ultimately held that because the EEOC was not a party to the arbitration agreement, it could pursue an action in court for both injunctive relief and victim-specific, monetary relief. (*Id.* at p. 296 [122 S.Ct. p. 765].)

The high court's post-*Broughton* decision in *Waffle House* requires that we overrule *Broughton* as being inconsistent with binding high court precedent. As I have explained, *Broughton* held that CLRA requests for injunctive relief are not arbitrable because the "purpose" of such relief is "to remedy a public wrong" and to protect "the general public," not to "compensat[e]" the plaintiff who pursues the CLRA claim. (*Broughton, supra,* 21 Cal.4th at p. 1080.) In *Waffle House,* the high court rejected this analysis, explaining that even large-scale requests for public "injunctive relief . . . can be seen as more closely tied to the [victim's] injury than to any public interest" and " 'is redress for individuals.' " (*Waffle House, supra,* 534 U.S. at p. 295 [122 S.Ct. at p. 765].) The high court also explained that in terms of public protection, "[p]unitive damages may often have a greater impact on" a defendant's "behavior . . . than the threat of an injunction . . . ." (*Ibid.*) This statement, in light of *Mastrobuono*'s holding that the FAA requires enforcement of agreements to arbitrate requests for punitive damages *notwithstanding a state law precluding such arbitration* (*Mastrobuono, supra,* 514 U.S. at pp. 53-58 [115 S.Ct. at pp. 1214-1217]), contradicts *Broughton*'s conclusion that we may base an FAA exception for CLRA injunctive relief on the public nature of such relief. As I have also explained, *Broughton* held that although the FAA requires enforcement of agreements to arbitrate requests for monetary relief, it does not require enforcement of agreements to arbitrate requests for injunctive relief designed to protect the public. The high court in *Waffle House* rejected this approach as well, holding that the precise distinction *Broughton* drew—between large-scale requests for injunctive relief to protect the public and requests for victim-specific, monetary relief—is invalid under the FAA, and that as a matter of federal law, the FAA requires courts to enforce an agreement to arbitrate requests for injunctive relief, even if that relief is designed principally to protect the public. (*Waffle House, supra,* 534 U.S. at pp. 294-296 [122 S.Ct. at pp. 764-765].) Thus, *Waffle House* requires that we overrule *Broughton* and hold that federal law requires enforcement of agreements to arbitrate CLRA requests for injunctive relief.

The majority's discussion of *Waffle House* completely misses the point of that decision. In *Waffle House,* the high court did not, as the majority

suggests, base its decision on the extent to which the EEOC "act[s] . . . on behalf of the public." (Maj. opn., *ante*, at p. 320, fn. 6.) In fact, the high court found that the lower federal court had erred in focusing on precisely this factor. (*Waffle House, supra,* 534 U.S. at pp. 290-296 [122 S.Ct. at pp. 762-765].) Instead, the high court held that because the FAA " 'does not require parties to arbitrate when they have not agreed to do so,' " the determinative issue is simply whether the EEOC "is a party to the contract" containing the arbitration provision. (*Waffle House, supra,* 534 U.S. at pp. 293-294 [122 S.Ct. at p. 764].) If not, then the EEOC has statutory authority to seek in court both large-scale injunctive relief to protect the public and damages. (*Id.* at p. 294 [122 S.Ct. at p. 764].) However, if the EEOC has agreed to arbitration, then it must arbitrate *all* of its claims—including any request for large-scale, public injunctive relief—and is "barred from pursuing *any* claim outside the arbitral forum." (*Id.* at p. 295 [122 S.Ct. at p. 765], italics added.) In the latter situation, in terms of arbitrability, no "line [may be] drawn . . . between injunctive and victim-specific relief." (*Id.* at p. 294 [122 S.Ct. at p. 764].) Thus, *Waffle House* establishes that contrary to *Broughton*, consumers, like Cruz, who have agreed to arbitration must arbitrate *all* of their claims, including requests for so-called public injunctions.

While the high court's post-*Broughton* decisions in *Circuit City* and *Waffle House* undermine one of *Broughton*'s fundamental premises—that states may decide that injunctive relief is somehow different from monetary damages for purposes of applying the FAA—the high court's third relevant post-*Broughton* decision in *Green Tree* undermines *Broughton*'s other fundamental premise: its *assumption* that "private arbitration" has several "institutional shortcomings" that render it inherently unsuitable for resolving requests for "public injunctions." (*Broughton, supra,* 21 Cal.4th at p. 1081.) In *Green Tree*, the plaintiff argued that the arbitration agreement she signed left her "unable to vindicate her statutory rights in arbitration"—and was therefore unenforceable—because its "silence with respect to [payment of] costs and fees create[d] a 'risk' that she [would] be required to bear prohibitive arbitration costs if she pursue[d] her claims in an arbitral forum." (*Green Tree, supra,* 531 U.S. at p. 90 [121 S.Ct. at p. 522].) The high court disagreed, finding that the agreement's mere "silence on the subject" of fees was "alone . . . insufficient to render it unenforceable." (*Id.* at p. 91 [121 S.Ct. at p. 522].) Instead, the court held, "a party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." (*Id.* at p. 92 [121 S.Ct. at p. 522].) In reaching this conclusion, the court acknowledged that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory

rights in the arbitral forum." (*Id.* at p. 90 [121 S.Ct. at p. 522].) However, the court held, absent evidence *in* "[*t*]*he record*" on this question, "[t]he 'risk' that [a plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." (*Id.* at p. 91 [121 S.Ct. at p. 522].) "To invalidate the agreement on that [speculative] basis," the court explained, "would undermine the 'liberal federal policy favoring arbitration agreements,' [citation]" and would "conflict with" the court's "prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." (*Ibid.*) Thus, the court held, courts may not justify invalidating arbitration agreements with "generalized attacks on arbitration that rest," not on evidence in the record, but "on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants.' [Citation.]" (*Id.* at pp. 89-90 [121 S.Ct. at p. 521].)

*Broughton*'s analysis is fundamentally inconsistent with the high court's subsequent decision in *Green Tree*. As I have explained, in invalidating agreements to arbitrate CLRA requests for injunctive relief, *Broughton* asserted that several "institutional shortcomings" of arbitration render it inherently unsuitable for resolving requests for "public injunctions." (*Broughton, supra,* 21 Cal.4th at p. 1081.) However, *Broughton* cited no evidence—in the record or otherwise—or judicially noticeable facts to establish, or even support, this assertion. Nor does the majority here cite any such evidence. Nor did the plaintiff in *Broughton* or Cruz in this case offer any evidence on this question; under *Green Tree*, it was their burden, as the parties seeking to invalidate the arbitration agreements, to offer such evidence. Thus, "[t]he 'risk' " that arbitration's so-called institutional shortcomings render it less effective than court proceedings for dealing with public injunctions is completely "speculative" and insufficient "to justify the invalidation of an arbitration agreement" requiring arbitration of CLRA requests for injunctive relief. (*Green Tree, supra,* 531 U.S. at p. 91 [121 S.Ct. at p. 522].) Indeed, the very existence of those shortcomings is completely speculative. In short, *Broughton*'s holding regarding arbitration of CLRA injunction requests rests on the very "generalized" and *unproven* " 'suspicion of arbitration' " that *Green Tree* holds *may not* be a basis for invalidating an arbitration agreement. (*Green Tree, supra,* 531 U.S. at p. 89 [121 S.Ct. at p. 521].) As the high court stated in *Green Tree*, "[t]o invalidate [arbitration] agreement[s] on [such a speculative] basis . . . undermine[s] the 'liberal federal policy favoring arbitration agreements.' [Citation.]" (*Green Tree, supra,* 531 U.S. at p. 91 [121 S.Ct. at p. p. 522].) Thus, *Green Tree* and the high court's other relevant post-*Broughton* decisions require that we overrule *Broughton* insofar as it invalidates agreements to arbitrate CLRA injunction requests, and that we hold that *all* of Cruz's claims are arbitrable.

IV. EXTENDING *BROUGHTON* TO UCL CLAIMS EVISCERATES THE STRONG PUBLIC POLICY FAVORING ENFORCEMENT OF ARBITRATION AGREEMENTS.

As *Broughton* recognized, the FAA is a "federal statutory mandate" that establishes a "strong public policy in favor of enforcing arbitration agreements." (*Broughton, supra*, 21 Cal.4th at p. 1073.) "Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ." (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 [103 S.Ct. 927, 941, 74 L.Ed.2d 765].) It "create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA]." (*Ibid.*) "[Q]uestions of arbitrability must be addressed with a healthy regard for [this] federal policy favoring arbitration. . . . The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," whatever the question at hand. (*Id.* at pp. 24-25 [103 S.Ct. at pp. 941-942].)

As *Broughton* also recognized, "California has a similar statute [citation] and a similar policy in favor of arbitration. [Citation.]" (*Broughton, supra*, 21 Cal.4th at p. 1074.) Code of Civil Procedure section 1281 provides that written arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." This section establishes the "fundamental policy" of California's arbitration scheme: "that arbitration agreements will be enforced *in accordance with their terms.*" (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 836, fn. 10 [88 Cal.Rptr.2d 366, 982 P.2d 229].) Through the statute's enactment, "the Legislature . . . expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.]" (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].) As we explained more than 85 years ago, "[t]he policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing." (*Utah Const. Co. v. Western Pac. Ry. Co.* (1916) 174 Cal. 156, 159 [162 P. 631].) Thus, California law, like federal law, establishes "a presumption in favor of arbitrability." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971 [64 Cal.Rptr.2d 843, 938 P.2d 903].)

In extending *Broughton* to hold that UCL claims for injunctive relief are not arbitrable, the majority guts the strong federal and state public policy favoring enforcement of arbitration agreements. As we have explained, the UCL's "scope is broad" and "[i]ts coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time

is forbidden by law.' " ' [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) In proscribing "any unlawful . . . business act or practice," Business and Professions Code section 17200 " ' "borrows" violations of other laws and treats these violations, *when committed pursuant to a business activity,* as unlawful practices independently actionable under [the UCL] and subject to the distinct remedies provided thereunder.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730], italics added.) In other words, "[a]n unlawful act *in the business context* is, by definition, an action of unfair competition" that may support a UCL action. (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 579 [71 Cal.Rptr.2d 731, 950 P.2d 1086] (conc. opn. of Baxter, J.), italics added.) Of course, because arbitration clauses are contractual, *every* arbitrable dispute will, by definition, involve business activity and acts in the business context. Thus, under the majority's holding, in *every* case where the parties have signed an arbitration agreement, the plaintiff can frustrate the defendant's contractual right to the benefits of an arbitral, rather than a judicial, forum—which both the high court and this court have recognized—simply by alleging a claim under the UCL and requesting injunctive relief. Thus, the majority's statutory construction guts the strong public policy favoring enforcement of arbitration agreements that both the California Legislature and the United States Congress have established by statute. It also does precisely what the high court has held states may not do: "wholly eviscerate congressional intent [in passing the FAA] to place arbitration agreements 'upon the same footing as other contracts,' [citation], simply by passing statutes" that make certain arbitration agreements void as a matter of state public policy. (*Southland, supra,* 465 U.S. at p. 17, fn. 11 [104 S.Ct. at p. 861].)

More specifically, because a UCL action may be based on a violation of other laws, the majority's holding will enable plaintiffs—through artful pleading—to obtain judicial determination of claims that they agreed to arbitrate and that the United States Supreme Court has expressly held to be arbitrable. In *Southland,* the high court held that where the FAA applies, claims under the California Franchise Investment Law are arbitrable notwithstanding a California statute prohibiting arbitration of such claims. (*Southland, supra,* 465 U.S. at p. 16 [104 S.Ct. at pp. 860-861].) Similarly, in *Perry,* the high court held that where the FAA applies, claims under California law for unpaid wages are arbitrable notwithstanding a California statute prohibiting arbitration of such claims. (*Perry, supra,* 482 U.S. at pp. 489-491 [107 S.Ct. at pp. 2525-2526].) Of course, a plaintiff may easily plead a violation of either our Franchise Investment Law or our wage payment statutes as a violation of the UCL. Under the majority's conclusion,

by doing so, a plaintiff can frustrate the defendant's contractual right to an arbitral, rather than judicial, forum for claims under the Franchise Investment Law and our wage payment statutes, despite the high court's binding and express holdings in *Southland* and *Perry* that the FAA requires enforcement of agreements to arbitrate these claims.[4] Indeed, the majority's conclusion vitiates numerous other high court holdings in precisely the same manner. The high court has held that the FAA requires enforcement of agreements to arbitrate claims under the federal Age Discrimination in Employment Act of 1967, the Sherman Act, the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act, and the Securities Act of 1933. (*Gilmer, supra,* 500 U.S. at pp. 27-28 [111 S.Ct. at pp. 1652-1653].) However, contrary to these binding holdings, because a violation of any of these federal statutes is also a violation of the UCL, the majority's conclusion enables a plaintiff to frustrate the defendant's contractual right to the benefits of an arbitral, rather than judicial, forum for these arbitrable federal claims simply by alleging them as violations of the UCL and requesting injunctive relief.[5]

Finally, given the extremely broad standing provisions applicable to claims under the UCL and Business and Professions Code section 17500, the majority vitiates these binding high court precedents and sacrifices the strong public policy favoring enforcement of arbitration agreements without justification. As the majority acknowledges (maj. opn., *ante,* at p. 315), Business and Professions Code section 17204 provides in part that UCL

---

[4]In reaching its conclusion in *Southland,* the high court expressly rejected the argument that the FAA allows states, in addition to Congress, to enact "public policy" limits on enforcing arbitration agreements subject to the FAA and to override agreements to arbitrate state-law disputes that " 'a state legislature . . . has decided should be left to judicial enforcement.' " (*Southland, supra,* 465 U.S. at p. 21 [104 S.Ct. at p. 864] (dis. opn. of Stevens, J.).) Similarly, in reaching its conclusion in *Perry,* the high court expressly rejected the argument that the FAA allows "state legislatures," like Congress, "to limit or preclude waiver of a judicial forum" for reasons of " 'public policy.' " (*Perry, supra,* 482 U.S. at p. 495 [107 S.Ct. at p. 2528] (dis. opn. of O'Connor, J.).) In rejecting these arguments, the high court in both cases held that there are *"only two limitations* on the enforceability of arbitration provisions governed by the [FAA]: they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' " (*Southland, supra,* 465 U.S. at pp. 10-11 [104 S.Ct. at p. 858], fn. omitted, italics added; see also *Perry, supra,* 482 U.S. at p. 489 [107 S.Ct. at p. 2525].) According to the court, " 'nothing in the [FAA] indicat[es] that the broad principle of enforceability is subject to any additional limitations *under state law.'* " (*Id.* at pp. 489-490 [107 S.Ct. at p. 2525], italics added; see also *Southland, supra,* 465 U.S. at p. 11 [104 S.Ct. at p. 858].)

[5]The majority's statement that "a stay is generally in order" when a plaintiff pleads both arbitrable and inarbitrable claims (maj. opn., *ante,* at p. 320) offers little solace. Instead, it simply highlights the fact that the majority's holding deprives defendants of their contractual right to the benefits of an arbitral, rather than a judicial, forum. Under the majority's holding, defendants may have to proceed in *both* fora.

actions for injunctive relief "shall be prosecuted" by the Attorney General of California, "any district attorney," specified "county counsel," "city prosecutor[s]" and "city attorney[s]," "or . . . *any person acting for the interests of . . . the general public.*" (Bus. & Prof. Code, § 17204, italics added.) Under our prior construction of this provision, "members of the public" other than a specific victim "also have standing to pursue unfair competition claims," so "the policy underlying the unfair competition statute can be vindicated [in court] by multiple parties" even if the specific victim has signed an arbitration agreement and is required to honor that agreement. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1204 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) A similar standing provision applies to actions for injunctive relief under Business and Professions Code section 17500. (Bus. & Prof. Code, § 17535.) Given these broad standing provisions, and given that a violation of the CLRA also constitutes a violation of the UCL, we need not eviscerate the public policy strongly favoring enforcement of arbitration agreements in order to protect the public or to vindicate the public interest in enforcement of these statutes. Here, we need not let Cruz out of his arbitration agreement so he can proceed in court as a private attorney general, when the Attorney General himself, and any member of the general public who has not signed an arbitration agreement, can play that role. Accordingly, I dissent from the majority's conclusion that Cruz's requests for injunctive relief are not arbitrable.

Baxter, J., and Brown, J., concurred.