Filed 7/28/22; Opinion on rehearing

OPINION ON REHEARING

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. MAPLEBEAR INC., Defendant and Appellant. | D079209 (Super. Ct. No. 37-2019-00048731-CU-MC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed.

Keker, Van Nest & Peters, Rachael E. Meny, Benjamin Berkowitz, Ryan K. Wong, Julia L. Allen, Taylor L. Reeves, and Erica S. Miranda for Defendant and Appellant.

Mara W. Elliot, City Attorney, Mark Ankcorn, Chief Deputy City Attorney, and Kevin B. King, Deputy City Attorney, for Plaintiff and Respondent.


The San Diego City Attorney brought an enforcement action under the Unfair Competition Law, Business and Professions Code sections 17200, et

seq. (UCL), on behalf of the People of the State of California against Maplebear Inc. DBA Instacart (Instacart).  In their complaint, the People alleged that Instacart unlawfully misclassified its employees as independent contractors in order to deny workers employee protections, harming its alleged employees and the public at large through a loss of significant payroll tax revenue, and giving Instacart an unfair advantage against its competitors.  In response to the complaint, Instacart brought a motion to compel arbitration of a portion of the City's action based on its agreements with the individuals it hires, called Shoppers.  The trial court denied the motion, concluding Instacart failed to meet its burden to show a valid agreement to arbitrate between it and the People.

Instacart challenges the court's order, asserting that even though the People are not a party to its Shopper agreements, they are bound by its arbitration provision to the extent they seek injunctive relief and restitution because these remedies are "primarily for the benefit of" the Shoppers.  As we shall explain, we reject this argument and affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

Instacart is a San Francisco-based company which operates a "communications platform" that "facilitates same-day, on-demand grocery shopping and delivery services in major metropolitan areas in California and throughout the United States."  The platform consists of a website and a smart phone application, or app.  Through the app, consumers are connected to Instacart's Shoppers, who gather groceries purchased by consumers on the app at various partner stores.  Instacart engages two types of Shoppers, "In-Store Shoppers," who gather the groceries in the partner store for consumers to pick up, and "Full-Service Shoppers," who gather the groceries in the partner store, purchase them with a debit card issued by Instacart, and

2

deliver the groceries to the consumer. This case concerns only Instacart's Full-Service Shoppers.

Before gaining access to Instacart's platform, Shoppers create a "registered profile through the Instacart app or website" and must sign its "Independent Contractor Agreement" as a condition of using Instacart's platform. The version of the Independent Contractor Agreement that has been in effect since 2017 includes an arbitration provision that states: "the Parties agree that to the fullest extent permitted by law, ANY AND ALL DISPUTES OR CLAIMS BETWEEN YOU AND INSTACART shall be exclusively resolved by final and binding arbitration by a neutral arbitrator, including without limitation any and all disputes or claims BETWEEN YOU AND INSTACART, whether in contract, tort, or otherwise, relating to the formation (including unconscionability and invalidity), existence, breach, termination, interpretation, enforcement, validity, scope, and applicability of the Agreement, or the Services agreed to herein, or any claim on any basis under federal, state, or local law, which could otherwise be heard before any court of competent jurisdiction."[1]

In September 2019, the People brought the present lawsuit alleging Instacart violated the UCL by misclassifying its Shoppers as independent contractors, and not employees. The People's complaint asserts Instacart maintains an unfair competitive advantage by misclassifying its Shoppers and evades "long-established worker protections under California Law." The People allege that Instacart "avoids paying its Shoppers a lawful wage and unlawfully defers substantial expenses to its Shoppers, including the cost of equipment, car registration, insurance, gas, maintenance, parking fees, and

_____

[1] Instacart asserts that "more than 99.8 percent" of its Shoppers "agree to be bound to its arbitration terms," which allow Shoppers to opt out of arbitration within 30 days of signing.

cell phone data usage."  Finally, the People assert that "Instacart also has an unfair advantage over its law-abiding competitors because, due to the misclassification, it contributes less to California's unemployment insurance, disability insurance and other state and federal taxes."

The complaint asserts one cause of action under the UCL alleging Instacart's misclassification of Shoppers is both unlawful under the Labor Code and an unfair business practice.  In the complaint's prayer for relief, the People seek first, civil penalties authorized by the UCL in cases prosecuted by the government of "up to $2,500 for each violation of the UCL, as proven at trial;" second, injunctive relief requiring Instacart to properly classify its employees; and, finally, restitution to the misclassified employees, "according to proof, for unpaid wages, overtime, and rest breaks, missed meals, and reimbursement for expenses necessary to perform the work."

In response to the complaint, Instacart filed a motion to compel a portion of the People's case—the prayers for injunctive relief and restitution—to arbitration based on its agreements with Shoppers.[2]  Before the motion was considered by the trial court, however, the People sought a temporary restraining order preventing Instacart from classifying its Shoppers in the City of San Diego as independent contractors.  On February 18, 2020, the court issued an order granting the request for a preliminary injunction against Instacart.

The court concluded the prosecution had shown a probability of success on the merits of its claim that Instacart had improperly classified its Shoppers under the test adopted by the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 and

---

[2]    Instacart did not seek to compel the complaint to arbitration to the extent it seeks civil penalties.

4

codified by the California Legislature's adoption of Assembly Bill No. 5 (2019–2020 Reg. Sess.), and that the balance of harms favored the People. The injunction issued by the court "enjoin[ed] and restrain[ed] Instacart from 'failing to comply with California employment law with regard to its Full-Service Shopper employees within the City of San Diego.' " (*California v. Maplebear, Inc.* (Feb. 17, 2021, No. D077380) [nonpub. opn.], rehg. denied Mar. 5, 2021 (*Maplebear I*).)

After the court issued the preliminary injunction, Instacart brought an ex parte application to stay enforcement of or dissolve the injunction. The trial court denied the application. The same day, Instacart filed its notice of appeal of the court's order imposing the injunction. Thereafter, and in advance of a previously scheduled hearing on Instacart's motion to compel arbitration, the court issued a tentative order staying the preliminary injunction under Code of Civil Procedure section 918 and stating the court lacked jurisdiction to determine the motion to compel arbitration in light of the appeal. At the hearing, the court confirmed the tentative ruling, pausing all proceedings in the trial court while this court considered Instacart's appeal.

While the appeal was pending, the electorate voted to enact Proposition 22, the "App-Based Drivers as Contractors and Labor Policies Initiative (2020)." (Prop. 22, as approved by voters, Gen. Elec. (Nov. 3, 2020).) The new law created an exception to *Dynamex* and Assembly Bill No. 5 for rideshare and grocery delivery companies like Instacart, calling into question the legality of the preliminary injunction. In February 2021, this court reversed the trial court's order, finding the injunction was unconstitutionally vague, "particularly in light of the changes to the law effectuated by Proposition 22." (*Maplebear I, supra*, D077380.)

5

On remand, litigation of Instacart's motion to compel arbitration resumed. Instacart re-calendared the motion for hearing, and filed an ex parte application for a stay of additional proceedings pending the determination of its motion. After briefing on the ex parte application, the court granted the stay. Several days later, the court issued a tentative ruling on the motion to compel arbitration, almost two months before the scheduled hearing on the motion, indicating it would deny the motion. The People then filed an ex parte application to expedite the hearing on the motion. The court granted the application at the ex parte hearing, advancing argument on the motion to compel arbitration to that day.

After argument by counsel, the court took the matter under submission. Thereafter, the court confirmed its tentative ruling denying the motion. The court found that Instacart had not met its burden to show the existence of a valid arbitration agreement between the parties. The trial court rejected Instacart's assertion that the People were bound by the Shopper's agreements with Instacart because the Shoppers were the "real parties in interest." Rather, focusing on the relief sought by the People, including civil penalties, the court concluded that the lawsuit was brought primarily for the benefit of the public. The trial court's thorough order distinguished the cases Instacart relied on in its briefing, which all involved lawsuits under the UCL brought by *private* individuals.

6

## DISCUSSION

On appeal, Instacart repeats the arguments it made in the trial court. It asserts that its agreements with Shoppers required the court to compel arbitration of the claims here because the City of San Diego's lawsuit is brought primarily to effectuate the rights of the Shoppers, whom Instacart characterizes as the real parties in interest.

### I

### *Legal Standards*

"We review the trial court's interpretation of an arbitration agreement de novo when, as here, that interpretation does not depend on conflicting extrinsic evidence." (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352 (*DMS*).) "Our de novo review includes the legal determination whether and to what extent nonsignatories to an arbitration agreement can [be bound by] the arbitration clause." (*Ibid*.)

Undoubtedly, both the federal government and "California ha[ve] a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes." (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835,843; see *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1195 [recognizing strong federal and state public policies favoring arbitration]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9; and *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971–972.) The federal policy favoring arbitration is codified by the Federal Arbitration Act (FAA), which "was enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code. … [I]ts 'purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the

same footing as other contracts." (*E.E.O.C. v. Waffle House, Inc.* (2002) 534 U.S. 279, 288–289 (*Waffle House*).)

"The FAA broadly provides that a written provision in 'a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. Employment contracts, except for those covering workers engaged in transportation, are covered by the FAA." (*Waffle House, supra*, 534 U.S. at p. 289.)

Even though the " ' "law favors contract for arbitration of disputes between parties" [citation], " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate ....' " ' " (*DMS, supra*, 205 Cal.App.4th at p. 1352; accord, *AT&T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 648 [" 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' "]; and *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1512 [" 'Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.' "].) As the U.S. Supreme Court has stated, arbitration "is a matter of consent, not coercion...." (*Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989) 489 U.S. 468, 479; see *Waffle House, supra*, 534 U.S. at p. 294 ["Because the FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements,' [citation], we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement."]; *ibid*. ["we do not override the clear intent of the

8

parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated"]; and *Walsh v. Arizona Logistics, Inc.* (9th Cir. 2021) 998 F.3d 393, 396 ["Although the FAA establishes 'a liberal federal policy favoring arbitration agreements,' [citation], it does not require arbitration beyond the terms agreed."] (*Walsh*).)

" 'Whether an agreement to arbitrate exists is a threshold issue of contract formation and state contract law.' [Citations.] 'The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement.' " (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 859.) "Because arbitration is a matter of contract, generally ' "one must be a party to an arbitration agreement to be bound by it or invoke it." ' " (*DMS, supra*, 205 Cal.App.4th at p. 1352.) "However, both California and federal courts have recognized limited exceptions to this rule, allowing nonsignatories to an agreement containing an arbitration clause to compel arbitration of, or be compelled to arbitrate, a dispute arising within the scope of that agreement." (*Id.* at p. 1353.) " ' "As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: '(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary.' " ' " (*Cohen,* at p. 859.)

## II

### *Analysis*

Instacart, of course, readily concedes the City of San Diego is not a signatory to its arbitration agreements with Shoppers. Instacart argues, however, that the City is bound by the agreements because it is, in effect, representing, or seeking to validate the individual employment law rights of,

the Shoppers. It asserts that the Shoppers are "the real part[ies] in interest" in this case.

In support of its argument, Instacart likens the City to a plaintiff bringing a claim under this state's Private Attorney General Act of 2004 (Lab. Code, § 2698, et seq., PAGA), in which a private citizen is statutorily authorized to bring a representative action on behalf of the state's Labor and Workforce Development Agency for civil penalties.[3] Inverting the holding in the California Supreme Court's decision in *Iskanian* that PAGA claims cannot be compelled to arbitration, Instacart argues that the City's injunctive relief and restitution claims here are private claims of the Shoppers that must be compelled to arbitration. Like the trial court, we reject this misconstruction of the holding of *Iskanian*.

---

[3] Under PAGA, " 'an "aggrieved employee" may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. (Lab. Code, § 2699, subd. (a).) Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the "aggrieved employees." (*Id*., § 2699, subd. (i).)' [¶] 'Before bringing a civil action for statutory penalties, an employee must comply with Labor Code section 2699.3. (Lab. Code, § 2699, subd. (a).) That statute requires the employee to give written notice of the alleged Labor Code violation to both the employer and the Labor and Workforce Development Agency, and the notice must describe facts and theories supporting the violation. (*Id*., § 2699.3, subd. (a).) If the agency notifies the employee and the employer that it does not intend to investigate ..., or if the agency fails to respond within 33 days, the employee may then bring a civil action against the employer. (*Id*., § 2699.3, subd. (a)(2)(A).) If the agency decides to investigate, it then has 120 days to do so. If the agency decides not to issue a citation, or does not issue a citation within 158 days after the postmark date of the employee's notice, the employee may commence a civil action. (*Id*., § 2699.3, subd. (a)(2)(B).)' " (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 380 (*Iskanian*).)

10

In *Iskanian*, an employee filed a class action lawsuit against his employer alleging it "failed to pay overtime, provide meal and rest breaks, reimburse business expenses, provide accurate and complete wage statements, or pay final wages in a timely manner." (*Iskanian, supra*, 59 Cal.4th at p. 361.) The lawsuit included PAGA claims for civil penalties. (*Ibid.*) The plaintiff employee's arbitration agreement with the defendant employer contained a provision precluding the employee from bringing class or representative actions, which the parties agreed included PAGA claims. (*Id.* at p. 378.) The *Iskanian* court rejected the employer's attempt to enforce the PAGA waiver, holding that "such an agreement has as its 'object, ... indirectly, to exempt [the employer] from responsibility for [its] own ... violation of law'" and, therefore, it "is against public policy and may not be enforced. (Civ. Code, § 1668.)" (*Iskanian,* at p. 383; *ibid.* ["The PAGA was clearly established for a public reason, and agreements requiring the waiver of PAGA rights would harm the state's interests in enforcing the Labor Code and in receiving the proceeds of civil penalties used to deter violations."].)

The court then concluded its holding invalidating the PAGA waiver did not result in preemption by the FAA. (*Iskanian, supra*, 59 Cal.4th at pp. 384–385.) The FAA preempts state laws that "stand[] as an obstacle to the accomplishment of the FAA's objectives." (*AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 343 (*Concepcion*).) *Iskanian* held that its "rule against PAGA waivers does not frustrate the FAA's objectives because … the FAA aims to ensure an efficient forum for the resolution of *private* disputes, whereas a PAGA action is a dispute between an employer and the state Labor and Workforce Development Agency." (*Iskanian,* at p. 384.)

In reaching this conclusion, the court looked to the language of the FAA and its legislative history. As noted, the FAA states, "A written provision in

11

any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The court held this language, which it recognized had been extended to include disputes over statutory rights in addition to contractual rights, "is most naturally read to mean a dispute about the respective rights and obligations of parties in a contractual relationship" and found its legislative history confirms "the FAA's primary object was the settlement of ordinary commercial disputes." (*Iskanian, supra*, 59 Cal.4th at p. 385.) Nothing in that history suggests "the FAA was intended to govern disputes between the government in its law enforcement capacity and private individuals." (*Ibid*.)

Consistent with this conclusion, the *Iskanian* court explained that "the United States Supreme Court's FAA jurisprudence—with [the exception of *Waffle House*, discussed below]—consists entirely of disputes involving the parties' *own* rights and obligations, not the rights of a public enforcement agency." (*Iskanian, supra*, 59 Cal.4th at p. 385.) Accordingly, *Iskanian* held "a PAGA claim lies outside the FAA's coverage because it is not a dispute between an employer and an employee arising out of their contractual relationship. It is a dispute between an employer and the *state*, which alleges directly or through its agents—either the Labor and Workforce Development Agency or aggrieved employees—that the employer has violated the Labor Code." (*Id.* at pp. 386–387.)

*Iskanian* looked to *Waffle House* to support its holding that a PAGA claim is not preempted by the FAA because the PAGA plaintiff stands in the shoes of a government actor. "In [*Waffle House*], the high court held that an

12

employment arbitration agreement governed by the FAA does not prevent the Equal Employment Opportunity Commission (EEOC) from suing an employer *on behalf of an employee bound by that agreement for victim-specific relief, such as reinstatement and back pay*. The court based its conclusion primarily on the fact that the EEOC was not a party to the arbitration agreement. ([*Waffle House, supra*, 534 U.S.] at pp. 288–289.) *Waffle House* further noted that the EEOC was not a proxy for the individual employee, that the EEOC could prosecute the action without the employee's consent, and that the employee did not exercise control over the litigation. (*Id*. at p. 291.)" (*Iskanian, supra*, 59 Cal.4th at p. 386, italics added.)

Instacart seizes on *Iskanian*'s statement that "[t]he government entity on whose behalf the [PAGA] plaintiff files suit is always the real party in interest in the suit," to argue the real parties in interest here are the Shoppers. (*Iskanian, supra*, 59 Cal.4th at p. 382.) We reject this analogy. The *Iskanian* court borrowed the real party in interest language from the arena of qui tam actions. The court held that a PAGA representative action is "a type of qui tam action," in which the plaintiff is deputized by the legislature to "augment the limited enforcement capability of the Labor and Workforce Development Agency by empowering employees to enforce the Labor Code as representatives of the Agency." (*Id*. at p. 383.)

The reverse does not hold true. The People are not deputized by the UCL to vindicate the individual rights of Instacart's Shoppers. Rather, the City of San Diego is acting in its own law enforcement capacity "to seek civil penalties for Labor Code violations traditionally prosecuted by the state." (*Iskanian, supra*, 59 Cal.4th at p. 388.) As *Iskanian* stated, "[t]here is no question that the enactment and enforcement of laws concerning wages, hours, and other terms of employment is within the state's historic police

13

power.  (See *Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 756 [' "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." ']; *Kerr's Catering Service v. Dept. of Industrial Relations* (1962) 57 Cal.2d 319, 326–327.)"  (*Iskanian,* at p. 388; see also *ibid.* ["Moreover, how a state government chooses to structure *its own* law enforcement authority lies at the heart of state sovereignty."].)  Put simply, the FAA is not concerned with the ability of the State of California to prosecute violations of the Labor Code and to seek civil penalties and related relief for those violations under the UCL.  Contrary to Instacart's assertion, the Shoppers are not the real party in interest in this case, the People are.[4]

Under *Waffle House*, the relevant binding authority here, the People's claims against Instacart cannot be compelled to arbitration based on the company's private contracts with its workers.  *Waffle House* considered an enforcement action by the EEOC against the defendant employer, alleging it

---

[4]     On June 15, 2022, the U.S. Supreme Court issued its opinion in *Viking River Cruises, Inc. v. Moriana* (2022) 142 S.Ct. 1906, prompting Instacart to seek rehearing in this case.  To address the new authority, we granted the petition, vacated our opinion, and requested supplemental briefing from the parties.  *Viking River* overturned *Iskanian*'s holding that arbitrable individual PAGA claims tied to inarbitrable representative PAGA claims cannot be compelled to arbitration.  (*Id.* at p. 1924 ["We hold that the FAA preempts the rule of *Iskanian* insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate."].)  *Viking River* left intact Iskanian's holding that representative PAGA claims are not arbitrable.  (*Id.* at pp. 1924–1925 ["The agreement between Viking and Moriana purported to waive 'representative' PAGA claims.  Under *Iskanian*, this provision was invalid if construed as a wholesale waiver of PAGA claims.  And under our holding, that aspect of *Iskanian* is not preempted by the FAA …."].)
        Because this case does not concern PAGA claims and because the City of San Diego is not a party to Instacart's arbitration agreement with its Shoppers, *Viking River* has no impact on this appeal.

engaged in discriminatory employment practices that violated the Americans with Disabilities Act of 1990 (ADA).  (*Waffle House, supra*, 534 U.S. at p. 283.)  The complaint arose out of an investigation that was initiated after a former employee of Waffle House, Eric Baker, suffered a seizure at work and was fired shortly after.  (*Ibid.*)  The EEOC's complaint alleged that Waffle House had violated the ADA, "including its discharge of Baker 'because of his disability,' and that its violation was intentional, and 'done with malice or reckless indifference to his federally protected rights.'  The complaint requested the court to grant injunctive relief to 'eradicate the effects of [respondent's] past and present unlawful employment practices,' to order specific relief designed to make Baker whole, including backpay, reinstatement, and compensatory damages, and to award punitive damages for malicious and reckless conduct.' "  (*Id.* at pp. 283–284.)

Waffle House unsuccessfully petitioned to compel the case to arbitration under the FAA based on the arbitration provision contained in Baker's employment agreement.  (*Waffle House, supra*, 534 U.S. at p. 284.)  On appeal, the federal circuit court held that the agreement did not require arbitration of the enforcement action entirely, but that the "EEOC was precluded from seeking victim-specific relief in court" and that the "EEOC's remedies in [the] enforcement action [were] limited to injunctive relief."  (*Id.* at pp. 284, 285.)  The Supreme Court granted review and reversed the order compelling the case to arbitration.

In reversing, the court first explained that Congress granted the EEOC the same enforcement powers with respect to discrimination claims that are afforded to the Attorney General and that individual employees can assert on their own behalf "in cases involving a 'pattern or practice' of discrimination." (*Waffle House, supra*, 534 U.S. at p. 286.)  Congress authorized the EEOC to

15

"bring suit to enjoin an employer from engaging in unlawful employment practices, and to pursue reinstatement, backpay, and compensatory or punitive damages." (*Id.* at p. 287.) The court then concluded that because the statutes at issue "unambiguously authorize the EEOC to obtain the relief that it seeks in its complaint if it can prove its case against respondent," and because Baker had no authority over or even involvement in the litigation, there was no basis to enforce the arbitration agreement against the EEOC as a nonparty to the agreement. (*Id.* at pp. 291–294.)

Like the EEOC in *Waffle House*, the City is indisputably not a party to any arbitration agreement with Instacart. No individual shopper has control over this litigation and the City did not need any individual Shopper's consent to bring the action. Like the EEOC, the City is in " 'command of the process' " and "controls both the litigation strategy and disposition of any recovery obtained for the employee[s]." (*Walsh, supra*, 998 F.3d at p. 397.) Just like the statutory authorization that gives the EEOC authority to pursue discrimination cases against employers, even where parallel private statutory claims may also lie, the UCL provides the City of San Diego with the same type of independent authority to assert UCL claims, including claims to enjoin unlawful and unfair business practices and obtain restitution for those who have been harmed by those practices.[5] (Bus. & Prof. Code,

---

[5]     Instacart argues that *Waffle House* is distinguishable because the court stated "the EEOC had 'exclusive jurisdiction' over its claims …." Instacart contends that unlike the claims in *Waffle House*, here the City of San Diego did not have exclusive jurisdiction because a Shopper could also pursue a UCL claim for restitution and injunctive relief. According to Instacart, this distinction shows the claims are in effect private in nature, and thus subject to its arbitration agreement.

16

§§ 17204 [authorizing actions for relief under the law by the "Attorney General or a district attorney or by a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or by a city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000"], 17206, subd. (a) [authorizing civil penalties up to $2,500 in cases brought by state officials in the name of the People of the State of California].)

Further, as the trial court found, the City's claims for civil penalties and injunctive relief seek to vindicate public harms. That the complaint also includes victim-specific restitution does not make the case private in nature. Rather, as *Waffle House* held, a government enforcement action that includes monetary relief for the victims of the unlawful activity advances a public purpose "because while punitive damages benefit the individual employee, they also serve an obvious public function in deterring future violations." (*Waffle House, supra*, 534 U.S. at pp. 294–295; see also *People v. Toomey* (1984) 157 Cal.App.3d 1, 25–26 ["Restitution is not intended to benefit the

Instacart's argument is not well taken. The passage referenced by Instacart was a rejection of the circuit court's holding that the injunctive relief pursued by the EEOC was arbitrable because it sought to vindicate the employee's individual rights. (*Waffle House, supra*, 534 U.S. at pp. 290–291.) The Supreme Court held otherwise, relying on the fact that the EEOC controlled the claim, not the employee whose discrimination complaint had initiated the EEOC investigation of the defendant employer. (*Id*. at pp. 290–291.) While the court noted that features of the statutory scheme in play required the employee to intervene in the EEOC's case rather than pursue a separate case, the lynchpin of its holding that the claim was not subject to arbitration was the fact that the EEOC, not the complaining employee, was the master of the litigation. (*Ibid*.) The same is true here, where there is no assertion that any particular Shopper can dictate the course of the litigation, or even participate in this case given their agreements to arbitrate.

[victims] by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations."] (*Toomey*).)

In addition, California courts have consistently held that the primary interest of law enforcement actions under the UCL is protecting the public, not private interests. "An action seeking injunctive relief and civil penalties filed by a public prosecutor on behalf of the People is not primarily concerned with restoring property or benefitting private parties; it is fundamentally a law enforcement action with a public, penal objective." (*Abbott Laboratories v. Superior Co*urt (2018) 24 Cal.App.5th 1, 22, revd. and remanded on other grounds, citing *Toomey, supra*, 157 Cal.App.3d at p. 26, and *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17.) "The request for restitution on behalf of [victims] is only ancillary to the primary remedies sought for the benefit of the public. While restitution would benefit the [victims] by the return of the money illegally obtained, such repayment is not the primary object of the suit...."[6] (*Id.* at p. 17.)

Instacart asserts that *Waffle House* does not apply because the EEOC was vindicating federal statutory rights and not a right protected by state law, which is subordinate to the FAA. We disagree. This distinction does not

---

[6] Instacart also argues that the "history and purpose of the UCL lend further support to [its] position" because "prior to the passage of Proposition 64 in 2004, any private party, whether injured or not, could bring a UCL claim for restitution and injunctive relief on behalf of the general public." Instacart contends the introduction of the standing requirement by Proposition 64 shows that government entities and private parties now have "equal standing to bring claims 'on behalf of others' for restitution and injunctive relief." This argument lacks merit. The introduction of a standing requirement for private UCL plaintiffs is not relevant to whether the City of San Diego's enforcement action should be subjected to a private arbitration agreement to which it is not a party.

lead to a different result.  Indeed, *Waffle House* explicitly rejected the circuit court's ruling "balanc[ing] the competing policies of the ADA and the FAA …." (*Waffle House, supra*, 534 U.S. at p. 297.)  Rather, the court was tasked with determining whether the policy favoring arbitration, as a general matter, should be extended over the government in its law enforcement capacity when it seeks to vindicate the employment rights of an individual who signed an arbitration agreement as a condition of the employment.  The U.S Supreme Court answered this question no, and *Waffle House* has not been overturned.  (*Walsh, supra*, 998 F.3d at p. 397.)  There is no reason to reach a different outcome here because the government authority is a state actor seeking to uphold state statutory rights.[7]

As it did in the trial court, Instacart also attempts to bring this case within its arbitration agreements with Shoppers based on the *Broughton-*

---

[7]    Citing *Comer v. Micor, Inc.* (9th Cir. 2006) 436 F.3d 1098, 1104, fn. 10, Instacart argues that "numerous courts have correctly rejected the 'categorical statements' in *Waffle House* that 'a contract cannot bind a non-party' and 'the FAA … does not require parties to arbitrate when they have not agreed to do so' as contrary to 'hundreds of years of common law.' " *Comer*, however, simply "noted in passing" that general language in *Waffle House* that a non-party to a contract cannot be bound by its arbitration provision did not negate law allowing " 'nonsignatories of arbitration agreements [to] be bound by [an] agreement under ordinary contract and agency principles,' " including " '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel' " or as third party beneficiaries." (*Id*. at p. 1101.)  Instacart does not contend any of these ordinary contract or agency theories supports enforcing its arbitration agreements with Shoppers against the City of San Diego.

*Cruz* rule.[8]  Instacart asserts that the People's "UCL claims for restitution, employee reclassification, and an injunction requiring Instacart to comply with the Labor Code" are "private in nature, and any benefits to the public from that relief" are merely incidental, and therefore the claims are arbitrable.  We agree with the City (and the trial court), that the premise of this argument is flawed because it is based on rules that apply where the plaintiff entered an arbitration agreement with the defendant and the relief sought is private.  The *Broughton-Cruz* rule—which precludes arbitration of injunctive relief claims that benefit the public and requires arbitration of claims seeking restitution and injunctive relief which primarily benefits the individual plaintiff—do not apply here, where there is no agreement between

---

[8]     Under the *Broughton-Cruz* rule, established by *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066 (*Broughton*) and *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303 (*Cruz*), " '[a]greements to arbitrate claims for public injunctive relief under the CLRA, the UCL, or the false advertising law are not enforceable in California.' " (*Clifford v. Quest Software Inc.* (2019) 38 Cal.App.5th 745, 751 (*Quest Software*).)  " 'The central premise of *Broughton-Cruz* is that "the judicial forum has significant institutional advantages over arbitration in administering a public injunctive remedy, which as a consequence will likely lead to the diminution or frustration of the public benefit if the remedy is entrusted to arbitrators." ' " (*Id.* at p. 752.)

the parties to arbitrate and the case is a law enforcement action brought for public benefit.[9]

Finally, Instacart claims that the trial court's order must be reversed because it creates a new exception to the FAA for law enforcement actions. Again, Instacart's framing of the issue is in error. As discussed, the FAA requires courts to enforce arbitration agreements. The law prevents courts from invalidating such an agreement based on a state law that improperly disfavors arbitration contracts. The FAA does not require courts to expand the contours of the agreement to compel non-parties, here the government, to arbitration. Indeed, Instacart cites no case that suggests such an expansion of an arbitration agreement is appropriate. Every case relied on by Instacart involves an individual employee or consumer who entered an arbitration agreement with an employer or a company from which the consumer obtained a good or service. These cases all start from the basic premise, absent here, that an agreement to arbitrate was entered by the plaintiff. (See *Concepcion*, *supra*, 563 U.S. at pp. 337–338 [plaintiffs brought false advertising claims

---

[9]    Instacart correctly points out that in *Cruz*, the California Supreme Court included a footnote stating, "The question whether someone who is not a party to an arbitration agreement may bring a representative action pursuant to Business and Professions Code section 17204 for restitution on behalf of injured consumers who are parties to the arbitration agreement is one that is not before us, and about which we express no opinion." (*Cruz, supra*, 30 Cal.4th at p. 320, fn. 7.) The portion of the opinion containing this footnote rejects an argument by amici curiae that the UCL restitution claims of anyone acting in the capacity of a private attorney general should not be subjected to arbitration if they represent other similarly situated employees. (*Id*. at p. 320.) While not clear from the language, the placement of the footnote suggests it is addressed to the issue of whether a private attorney general, still permissible at the time *Cruz* was issued because the case predates Proposition 64, could avoid arbitration, and not whether an actual law enforcement officer not a party to the agreement could be compelled to arbitrate.

21

against their cell phone service provider, whose terms of service included agreement to arbitration containing a class action waiver]; *Broughton, supra*, 21 Cal.4th at pp. 1072–1073 [plaintiffs brought deceptive advertising claims against health insurance company, whose evidence of coverage and disclosure documents contained mandatory arbitration provision]; *Cruz, supra*, 30 Cal.4th at pp. 308–309 [plaintiff brought deceptive advertising claims against health care provider, who moved to compel claims to arbitration based on mandatory arbitration in subscriber agreement between provider and employer, under which plaintiff obtained coverage]; *Quest Software, supra*, 38 Cal.App.5th at p. 748, fn. 2 [employee brought suit against employer for classifying him as "exempt;" employee plaintiff assumed for purposes of appeal that he consented to employer's arbitration agreement]; *Torrecillas v. Fitness Internat., LLC* (2020) 52 Cal.App.5th 485 [employee brought suit against employer despite a binding arbitration agreement between them]; see also *Iskanian, supra*, 59 Cal.4th at p. 359 [employee's class action lawsuit for his employer's alleged failure to compensate its employees for overtime and meal and rest periods, where "employee had entered into an arbitration agreement that waived the right to class proceedings"].)

Contrary to Instacart's argument, the City is not attempting to circumvent or evade an applicable arbitration agreement between Instacart and its Shoppers. Rather, it is exercising its authority to enforce state law on behalf of the People of California. Instacart's claim that the trial court created a new categorical exemption to mandatory arbitration for private claims brought by a public prosecutor is a distortion of the court's order. The fundamental premise of the FAA is to ensure that agreements to arbitrate stand on equal footing to all contracts. However, the policy favoring arbitration does not apply when the parties have not agreed to arbitrate. As

22

in *Waffle House*, here there is no private claim and the City "does not stand in the employee's shoes" for the purposes of this case. (*Waffle House, supra*, 534 U.S. at p. 297; see also *Walsh, supra*, 998 F.3d at p. 397 [rejecting defendant employer's argument that the federal Secretary of Labor's claims under the Fair Labor Standards Act could be compelled to arbitration under employer's arbitration agreement with employees who Secretary asserted were misclassified as independent contractors].) Rather, the City is acting in its capacity as a public prosecutor exercising its traditional police powers.

## DISPOSITION

The order is affirmed. Appellate costs are awarded to the Respondent City of San Diego.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

DATO, J.